UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DAHLIA DAMAS, New York County Public
Administrator, in her capacity as Administrator of the
ESTATE OF MESSIAH NANTWI,

*Plaintiff*,

-against-

CORRECTION OFFICER JOSHUA BARTLETT;
CORRECTION OFFICER CALEB BLAIR;
CORRECTION OFFICER DANIEL BURGER;
SERGEANT FRANCIS CHANDLER; CORRECTION
OFFICER DEAN CROSS; CORRECTION OFFICER
THOMAS ECK; SERGEANT DAVID FERRONE;
SUPERINTENDENT OF MID-STATE CORRECTIONAL
FACILITY BRYAN HILTON; SERGEANT MICHAEL
IFFERT; CORRECTION OFFICER FRANK JACOBS;
CORRECTION OFFICER ADAM JOSEPH;
CORRECTION OFFICER CRAIG KLEMICK;
CORRECTION OFFICER ZACHARY LALLIER;
CORRECTION OFFICER JONAH LEVI;
COMMISSIONER OF THE NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION DANIEL F.
MARTUSCELLO III; CORRECTION OFFICER
NATHAN PALMER; CORRECTION OFFICER RYAN
RUSSELL; CORRECTION OFFICER TRISTAN
SHEPPARD; SERGEANT DONALD SLAWSON;
CORRECTION OFFICER NICHOLAS VITALE; and
JOHN AND JANE DOES 1-20, as yet identified
individuals,

*Defendants*.

---

9:25-cv-775   BKS/PJE

Index No.

**COMPLAINT AND
JURY DEMAND**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 4

JURISDICTION AND VENUE ............................................................................... 6

JURY DEMAND.................................................................................................... 7

PARTIES ............................................................................................................... 7

STATEMENT OF FACTS ...................................................................................... 9

    I.    The Fatal Attack on Messiah Nantwi on March 1, 2025............................. 9

        A.    The On-Scene Defendants Brutally and Unjustifiably Beat Messiah
            Nantwi to Death While He Was Handcuffed and Defenseless.................. 9

        B.    The On-Scene Defendants Transport Mr. Nantwi to the Infirmary and
            Continue to Beat Him ............................................................................ 12

    II.    The On-Scene Defendants Conspire to Cover Up Mr. Nantwi's Murder..........14

        A.    The On-Scene Defendants Conspire to Plant a Weapon in
            Mr. Nantwi's Cell ................................................................................. 14

        B.    The On-Scene Defendants Destroy the Evidence of Mr. Nantwi's
            Beating ................................................................................................. 15

        C.    The On-Scene Defendants Conspire to File False 2104A Reports........... 15

        D.    The On-Scene Defendants Meet for Breakfast the Next Day to
            Align Their Stories ................................................................................ 16

    III.    The On-Scene Defendants are Criminally Charged in Connection with Mr.
        Nantwi's Death..............................................................................................17

    IV.    Defendants Martuscello and Hilton are Responsible for Mr. Nantwi's Fatal
        Beating..........................................................................................................17

        A.    Defendants Martuscello and Hilton Were Aware of and Deliberately
            Indifferent to the Culture of Violence Within DOCCS Facilities............ 20

            i.    The Marshall Project and New York Times Investigation
                Reports Rampant Abuse Throughout DOCCS Facilities............. 21

            ii.    Recent Jury Verdicts, Settlements, and Criminal Pleas Reveal
                Persistent Physical Violence and Abuse Across DOCCS
                Facilities............................................................................... 25

            iii.    A Second Marshall Project and New York Times Investigation
                 Reports Pervasive Pattern of Coverups Across DOCCS
                Facilities............................................................................... 28

            iv.    Prisoners' Rights Advocates Warned Defendants Martuscello
                 and Hilton of the Risk of Violence Against Incarcerated
                Individuals............................................................................ 29

        B.    Defendants Martuscello and Hilton Were Aware of and Deliberately

Indifferent to Decades of Rampant Violence by Correction Officers
at Mid-State .......................................................................................... 31

    i.     Thirty Correction Officers Conduct a Violent Raid at
         Mid-State in 2016 ................................................................. 32

    ii.    CANY's 2023 Monitoring Report Details Widespread
        Physical Abuse by Staff at Mid-State ............................. 34

    iii.   Correction Officers Brutally Beat James Barton at Mid-State
        in 2023 ................................................................................. 37

    iv. Defendant Levi Assaults Shayzon Taylor at Mid-State in 2023 ........ 39

    v.  CANY's 2025 Report Details Continued Physical Abuse by Staff
       at Mid-State ......................................................................... 41

    vi.   Defendants Chandler and Bartlett Assault Christopher Quiles
        at Mid-State One Day Before Mr. Nantwi Is Killed ..................... 43

C.    Defendants Martuscello and Hilton Were Aware that Correction
      Officers Had Fatally Beaten Robert Brooks Only Three Months
      Earlier ................................................................................................. 45

D.    Defendants Martuscello and Hilton Were Aware of and Deliberately
      Indifferent to the Risk of Harm Posed by CERT Officers ........................ 50

E.    Defendants Martuscello and Hilton Were Aware of and Deliberately
      Indifferent to the Volatility and Heightened Risk of Harm to
      Incarcerated People Caused by the Wildcat Strikes ................................ 53

FIRST CAUSE OF ACTION ................................................................................. 54

SECOND CAUSE OF ACTION ............................... **ERROR! BOOKMARK NOT DEFINED.**

THIRD CAUSE OF ACTION ................................................................................. 56

FOURTH CAUSE OF ACTION .............................................................................. 57

DAMAGES ........................................................................................................ 600

PRAYER FOR RELIEF ....................................................................................... 61

Plaintiff Dahlia Damas, New York County Public Administrator, in her capacity as Administrator of the Estate of Messiah Nantwi, by and through her Attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for her complaint alleges as follows:

## PRELIMINARY STATEMENT

1.     This case is about the horrifying, savage, and wholly unjustified murder of 22-year-old Messiah Nantwi by a gang of correction officers at Mid-State Correctional Facility ("Mid-State") on March 1, 2025.

2.     At the time of his fatal beating, Mr. Nantwi was unarmed, handcuffed, and utterly defenseless.

3.     For over five minutes, *at least eighteen* correction officers and sergeants (the "On-Scene Defendants") viciously punched, kicked, and stomped on Mr. Nantwi's body, head, and face using their fists, batons, and boots, and/or stood by and watched.  The On-Scene Defendants purposely turned their body cameras off or faced away from the beating so that they would not record their colleagues' violent attack on Mr. Nantwi.

4.     Mr. Nantwi was eventually taken to a nearby hospital in Utica, New York where he was pronounced dead, due to massive head trauma and numerous blows to the body.

5.     Upon realizing that they would have to account for Mr. Nantwi's death, the On-Scene Defendants immediately conspired to cover up their misconduct by agreeing to plant a weapon in Mr. Nantwi's cell to support the false narrative that Mr. Nantwi had been armed and to justify their use of force.

6.     As gruesome and reprehensible as Mr. Nantwi's murder was, it was by no means an anomaly in New York State Department of Corrections and Community Supervision ("DOCCS") facilities.  Mr. Nantwi was murdered only *three months* after another incarcerated

individual, Robert Brooks, was fatally beaten by a group of correction officers in a strikingly similar way, directly across the street at Marcy Correctional Facility.

7.      As illustrated by these two murders, which occurred within 82 days and a one-mile radius of each other, DOCCS facilities suffer from a well-documented and pervasive pattern, practice, and custom of correction officers using excessive, and sometimes fatal, force against incarcerated people in their care and custody.

8.      As a result of this longstanding pattern, and the culture of sanctioned violence that it represents, the On-Scene Defendants were emboldened to viciously beat Mr. Nantwi to death without concern or hesitation.

9.      Following Mr. Nantwi's death, Jennifer Scaife, the Executive Director of Correctional Association of New York ("CANY"), noted that the tragedy "underscores the need for a complete overhaul and fundamental rethinking of the state's prison system."[1]

10.     Governor Hochul called Mr. Nantwi's death "deeply, deeply disturbing" and similarly noted that it is a "reminder of the need for real systemic change within our correctional system."[2]

11.     Defendant DOCCS Commissioner Daniel F. Martuscello III condemned the murder of Mr. Nantwi and admitted the need to "create a culture [within DOCCS] that isn't

---

[1] *CANY Statement in Response to Death of Incarcerated Individual at Mid-State Correctional Facility*, CANY (March 4, 2025), https://www.correctionalassociation.org/press-releases-archive/correctional-association-of-new-york-cany-statement-in-response-to-death-of-incarcerated-individual-at-mid-state-correctional-facility.
[2] Associated Press, *New York prison guards indicted in connection with an inmate's death, governor says*, CNN (April 15, 2025), https://www.cnn.com/2025/04/15/us/new-york-prison-guards-indicted-inmate-death; Press Release, *Statement from Governor Hochul* (March 4, 2025), https://www.governor.ny.gov/news/statement-governor-kathy-hochul-63.

based in violence and [that] respects the lives of everyone in our care." Defendant Martuscello

vowed not to let these "horrible acts" "continue" and "define us."[3]

12.     As is clear from Ms. Scaife, Governor Hochul, and Defendant Martuscello's

statements, this pattern and culture of violence and abuse within DOCCS facilities has been

known to DOCCS officials for far too long.

13.     Accordingly, the responsibility for Mr. Nantwi's death extends beyond the On-

Scene Defendants and includes Defendants Martuscello and Mid-State Superintendent Bryan

Hilton, each of whom were personally aware of the deeply entrenched pattern and practice of

excessive force that plagues DOCCS facilities, including Mid-State, and failed entirely to protect

Mr. Nantwi from it.

## JURISDICTION AND VENUE

14.     This action seeks redress pursuant to 42 U.S.C. § 1983 for Defendants' violations

of rights protected by the Eighth and Fourteenth Amendments to the United States Constitution.

15.     This Court has subject matter jurisdiction over Plaintiff's federal law claims

pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws

of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color

of state law, of rights guaranteed by the Constitution of the United States.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

17.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events

giving rise to the claims asserted in this Complaint occurred in this judicial district.

---

[3] *Id.*

## JURY DEMAND

18.     Plaintiff demands a trial by jury in this action.

## PARTIES

19.     Plaintiff Dahlia Damas is the Public Administrator of New York County (the "Public Administrator") and the duly appointed Administrator of the Estate of Messiah Nantwi.

20.     Messiah Nantwi was a citizen of the United States and resided at Mid-State Correctional Facility ("Mid-State") at the time these events occurred.

21.     At all times relevant to this Complaint, Defendants Joshua Bartlett, Caleb Blair, Daniel Burger, Dean Cross, Thomas Eck, Frank Jacobs, Adam Joseph, Craig Klemick, Zachary Lallier, Jonah Levi, Nathan Palmer, Ryan Russell, Tristan Sheppard, and Nicholas Vitale were employed by DOCCS as correction officers at Mid-State.

22.     At all times relevant to this Complaint, Defendants Francis Chandler, David Ferrone, Michael Iffert, and Donald Slawson were employed by DOCCS as sergeants at Mid-State.

23.     At all times relevant to this Complaint, Defendants John and Jane Does 1-20 were employes of DOCCS whose identities are currently unknown to Plaintiff but who participated in Mr. Nantwi's assault and/or failed to intervene to stop it.

24.     At all times relevant to this Complaint, Defendant Bryan Hilton was the Superintendent at Mid-State.

25.     Prior to becoming Superintendent of Mid-State, Defendant Hilton served in other supervisory roles at DOCCS, including as an Assistant Commissioner for DOCCS.

26.    In his role as Superintendent, Defendant Hilton was responsible for the safety and security of incarcerated individuals and staff and assumed responsibility for overseeing all aspects of day-to-day life at Mid-State.

27.    In his role as Superintendent, Defendant Hilton set policies, customs, and practices at Mid-State and was responsible for monitoring Mid-State correction officers' compliance with those policies.

28.    In his role as Superintendent, Defendant Hilton was responsible for reviewing reports of correction officers' use of force against incarcerated individuals and associated documentation to assess whether the correction officer complied with DOCCS directives.

29.    In his role as Superintendent, Defendant Hilton was responsible for monitoring Mid-State correction officers to determine whether they posed a risk to incarcerated individuals' safety.

30.    In his role as Superintendent, Defendant Hilton had a variety of tools available to him to evaluate whether a particular correction officer posed a risk to inmate safety, including reviewing inmate grievances, use of force reports, unusual incident reports, the human resources files, discipline documentation, and lawsuits filed against the employee.

31.    In his role as Superintendent, Defendant Hilton was responsible for taking action to ensure the safety and security of incarcerated individuals.

32.    In his role as Superintendent, Defendant Hilton had a variety of tools available to him to reduce the risk of harm that correction officers posed to incarcerated individuals including counseling, temporary reassignment, additional training, pursuing discipline, and meeting with the individual officer and/or their supervisor.

33.     At all times relevant to this Complaint, Defendant Daniel Martuscello III was the Commissioner of DOCCS.

34.     Defendant Martuscello assumed oversight of DOCCS as Acting Commissioner on June 9, 2023, and formally became Commissioner of DOCCS on May 23, 2024.

35.     In his role as Commissioner, Defendant Martuscello set policies, customs, and practices for DOCCS.

36.      In his role as Commissioner, Defendant Martuscello was ultimately responsible for ensuring the safety of individuals in DOCCS custody.

37.     Prior to becoming Commissioner, Defendant Martuscello had nearly three decades of experience working for DOCCS in various capacities. For six years prior to becoming Commissioner, Martuscello served as second-in-command to Commissioner Anthony Annucci. When Defendant Martuscello became Commissioner of DOCCS, he was widely recognized for his vast institutional knowledge of DOCCS.

38.     At all times relevant to this Complaint, every Defendant named in the Complaint was acting within the scope of his employment and under color of state law.

## STATEMENT OF FACTS[4]

### I.     The Fatal Attack on Messiah Nantwi on March 1, 2025

### A.     The On-Scene Defendants Brutally and Unjustifiably Beat Messiah Nantwi to Death While He Was Handcuffed and Defenseless

39.     On Saturday, March 1, 2025 at approximately 10:50 a.m., Mr. Nantwi, a 22-year-old man, was in the shower area at Mid-State Correctional Facility.

---

[4] All facts alleged herein are upon information and belief, based on counsel's review of information in court documents, including the indictments issued in connection with Mr. Nantwi's death, as well as in news articles, publicly available investigative reports, autopsy findings, PACER, NYSCEF, and other sources of publicly available information.

40.    At approximately 10:50 a.m., National Guardsmen Nicholas Mouzon and Davian Walters directed Mr. Nantwi to return to his cell for the "Count" of incarcerated people in the prison that was scheduled to occur at 11:00 a.m.

41.    Mr. Nantwi stated that he did not want to return to his cell for "Count".

42.    During this verbal interaction with Mr. Mouzon and Mr. Walters, Mr. Nantwi was unarmed and made no physical advances towards them.

43.    After a few minutes, Mr. Nantwi's cellmate persuaded Mr. Nantwi to return to his cell, which he did without any issue or further incident.

44.    At 10:58 a.m., Mr. Mouzon and Mr. Walters made a request for assistance, which was broadcast to all correction staff throughout Mid-State.

45.    Within minutes of the request for assistance, a Corrections Emergency Response Team ("CERT"), comprised of Defendants Bartlett, Blair, Burger, Chandler, Cross, Eck, Ferrone, Iffert, Jacobs, Joseph, Klemick, Lallier, Levi, Palmer, Russell, Sheppard, Slawson, and Vitale, (the "On-Scene Defendants") responded to Building 22 and entered Mr. Nantwi's room.

46.     When the On-Scene Defendants entered Mr. Nantwi's room, Mr. Nantwi held his arms up in a gesture of compliance and displayed no weapon.

47.    The National Guardsmen pointed at Mr. Nantwi, and the On-Scene Defendants immediately grabbed Mr. Nantwi, handcuffed him, and began to beat him, and/or failed to intervene as their colleagues began to beat Mr. Nantwi, despite having a reasonable opportunity to do so.

48.    While the On-Scene Defendants beat Mr. Nantwi and/or failed to intervene as their colleagues beat Mr. Nantwi, Defendant Vitale shoved Mr. Nantwi's cellmate against the wall, told him to "shut up," and restrained him.

49.     The On-Scene Defendants violently beat Mr. Nantwi for approximately five minutes, using their fists, batons, and boots, and/or failed to intervene as their colleagues beat Mr. Nantwi, despite having a reasonable opportunity to do so.

50.     The On-Scene Defendants kicked, punched, and struck Mr. Nantwi's body, face, and head repeatedly with their fists, batons, and boots, and/or failed to intervene as their colleagues beat Mr. Nantwi, despite having a reasonable opportunity to do so.

51.     During the course of this brutal assault, the On-Scene Defendants picked Mr. Nantwi up and slammed his body back on the ground, and/or failed to intervene as their colleagues beat Mr. Nantwi, despite having a reasonable opportunity to do so.

52.     In self-defense, Mr. Nantwi grabbed Defendant Bartlett's vest and attempted to bite Defendants Blair and Eck's hands through their gloves.

53.     Mr. Nantwi's attempted self-defense only intensified the beating.

54.     Throughout the attack, Mr. Nantwi pleaded with officers to stop, including saying repeatedly "I didn't do nothing," and "Stop, you're really hurting me!"

55.     The On-Scene Defendants ignored Mr. Nantwi's pleas and yelled at him to "stop resisting," even though Mr. Nantwi, who was handcuffed and being attacked by a large group of officers, could not resist the attack.

56.     Mr. Nantwi lost consciousness at least twice during the beating and returned to consciousness as the On-Scene Defendants continued to punch, beat, and kick him, and/or failed to intervene as their colleagues beat Mr. Nantwi, despite having a reasonable opportunity to do so.

57.    Throughout the fatal beating, the On-Scene Defendants were either not wearing their mandated body cameras or had turned them off or away from Mr. Nantwi to ensure they would not capture the beating on video.

58.    Despite either directly participating or seeing, hearing, and/or otherwise knowing that Mr. Nantwi was being beaten to death for approximately five minutes, all the On-Scene Defendants stood in or near Mr. Nantwi's cell and failed to intervene to stop Mr. Nantwi's assault, despite having a reasonable opportunity to do so.

59.    All the On-Scene Defendants were deliberately indifferent to Mr. Nantwi's obvious need for critical medical care, including his bleeding and physical injuries, that could have saved his life.

60.    All the On-Scene Defendants either actively participated in beating Mr. Nantwi to death, stood by while it occurred and failed to intervene as their colleagues beat Mr. Nantwi, or both.

**B.    The On-Scene Defendants Transport Mr. Nantwi to the Infirmary and Continue to Beat Him**

61.    After viciously beating Mr. Nantwi inside his room for approximately five minutes, the On-Scene Defendants dragged Mr. Nantwi out of his cell and/or failed to intervene as their colleagues dragged Mr. Nantwi out of his cell, despite having a reasonable opportunity to do so.

62.    Mr. Nantwi was unconscious and covered in blood as he was dragged out of his cell.

63.    Mr. Nantwi was making gurgling noises as he was dragged out of his cell and into the stairwell, indicating his inability to breathe.

64.     The On-Scene Defendants dragged Mr. Nantwi down the stairs of Building 22 and/or failed to intervene as their colleagues dragged Mr. Nantwi down the stairs, despite having a reasonable opportunity to do so.

65.     The On-Scene Defendants continued to beat Mr. Nantwi in the stairwell and/or failed to intervene as their colleagues beat Mr. Nantwi, despite having a reasonable opportunity to do so.

66.     After dragging Mr. Nantwi down the stairs, the On-Scene Defendants deposited Mr. Nantwi in a holding cell at the Mid-State Infirmary.

67.     Defendant Blair continued to beat Mr. Nantwi while he was in the Infirmary holding cell.

68.     The remaining On-Scene Defendants failed to intervene to stop Defendant Blair's continued beating of Mr. Nantwi, despite having a reasonable opportunity to do so.

69.     The On-Scene Defendants were deliberately indifferent to Mr. Nantwi's obvious need for critical medical care that could have saved his life.

70.     The On-Scene Defendants left Mr. Nantwi unattended in the holding cell in the Infirmary for several minutes, despite his clear need for urgent medical treatment.

71.     Later that day, Mr. Nantwi was transported to Wynn Hospital, where he was pronounced dead.

72.     Mr. Nantwi's cause of death was reported as massive head trauma, accompanied by numerous blows to the body.

73.     The On-Scene Defendants' brutal assault, as described above, was the sole cause of Mr. Nantwi's death.

## II.    The On-Scene Defendants Conspire to Cover Up Mr. Nantwi's Murder

### A.    The On-Scene Defendants Conspire to Plant a Weapon in Mr. Nantwi's Cell

74.    Once it became clear that Mr. Nantwi was in dire condition, the On-Scene Defendants conspired to orchestrate a cover up of Mr. Nantwi's murder, designed to justify the force used on Mr. Nantwi and to shield certain On-Scene Defendants from responsibility.

75.    In furtherance of this cover up scheme, Defendant Chandler ordered an officer to retrieve a makeshift knife that had been confiscated earlier that day in an incident wholly unrelated to Mr. Nantwi's beating.

76.    After receiving the weapon, Defendant Chandler asked loudly which officer would "volunteer" to falsely claim that he had discovered the weapon in Mr. Nantwi's room, to support the false narrative that Mr. Nantwi was armed and that the use of force by the On-Scene Defendants was justified.

77.    Defendant Eck volunteered to claim that he had discovered the weapon in Mr. Nantwi's room.

78.    Defendant Eck later claimed that he had found the weapon in Mr. Nantwi's room, despite knowing full well that he and Defendants Ferrone and Chandler had conspired to plant it in Mr. Nantwi's room after the assault had finished.

79.    Defendant Ferrone was recorded discussing the weapon on a camera placed in the Infirmary's restroom.

80.    After seeing the camera and realizing it had been recording him, Defendant Ferrone uttered an expletive.

**B.    Defendant Slawson Destroys the Evidence of Mr. Nantwi's Beating**

81.    After Mr. Nantwi was transported to the hospital, Defendant Slawson mopped up Mr. Nantwi's blood from the floor of the Infirmary holding cell.

82.    By cleaning up Mr. Nantwi's blood, Defendant Slawson knowingly destroyed key evidence and prevented law enforcement from conducting any analysis of blood or blood spatter evidence.

83.    By destroying this evidence, Defendant Slawson impaired law enforcement's ability to determine precisely what happened to Mr. Nantwi and identify those involved in the assault.

**C.    The On-Scene Defendants Conspire to File False 2104A Reports**

84.    Almost immediately after Mr. Nantwi was transported to the hospital, Defendants Chandler and Ferrone ordered the On-Scene Defendants to assemble in Building 3, where they began discussing how to fill out the required 2104A reports.

85.    DOCCS officers are required to truthfully complete Form 2104A reports whenever force is used against an incarcerated individual.

86.    In filling out a Form 2104A report, correction officers are required to truthfully list all staff present and all staff involved in the use of force, outline what force the officer employed, and detail what force by others he witnessed.

87.    Form 2104A reports become part of the permanent case file regarding the use of force against an incarcerated individual and may be used in subsequent criminal or civil litigation.

88.    While assembled in Building 3, Defendant Levi pleaded that the On-Scene Defendants omit him from their 2104A reports regarding the fatal beating of Mr. Nantwi.

15

89.     Defendant Chandler similarly requested that the On-Scene Defendants omit him from their 2104A reports regarding the fatal beating of Mr. Nantwi.

90.     Defendant Ferrone was aware of and sanctioned both Defendant Chandler and Defendant Levi's requests that the On-Scene Defendants omit their names from the 2104A reports.

**D.     The On-Scene Defendants Meet for Breakfast the Next Day to Align Their Stories**

91.     On March 2, 2025, Defendant Chandler ordered the On-Scene Defendants to meet for breakfast at Raspberries Diner in Marcy, New York.

92.     On March 2, 2025, the On-Scene Defendants gathered at Raspberries Diner, and while there, conspired to develop and coordinate the false narrative that the use of force against Mr. Nantwi was justified because he had been armed with a weapon.

93.     The On-Scene Defendants also agreed to report that Defendants Chandler and Levi had not used any force against Mr. Nantwi.

94.     Defendant Chandler ordered all the On-Scene Defendants to "stick with the story."[5]

95.     The On-Scene Defendants all agreed to file and ultimately did file false 2104A reports that omitted any mention of Defendants Chandler and Levi, despite knowing that Defendants Chandler and Levi had participated in the fatal beating of Mr. Nantwi.

96.     Defendant Iffert similarly agreed to and ultimately did file a false 2104A report, stating that he witnessed no use of force against Mr. Nantwi and claiming that he did not have a clear view into Mr. Nantwi's room, when in fact Defendant Iffert was standing directly outside

---

[5] *See People v. Levi et al*, Indictment No. I 2025-090, Oneida Cnty. Ct. (N.Y. 2025).

Mr. Nantwi's room when the assault began and remained in the hallway for the duration of the fatal beating.

### III.    The On-Scene Defendants are Criminally Charged in Connection with Mr. Nantwi's Death

97.    On March 2, 2025, DOCCS initiated an investigation into the circumstances surrounding Mr. Nantwi's death.

98.    On April 16, 2025, a grand jury indictment was unsealed, charging Defendants, Blair, Burger, Chandler, Eck, Ferrone, Iffert, Levi, Klemick, Slawson, and Vitale with various criminal offenses in connection with Mr. Nantwi's fatal beating.[6]

99.    Defendants Bartlett, Cross, Jacobs, Joseph, Lallier, Palmer, Russell, and Sheppard were also charged in connection with Mr. Nantwi's fatal beating.

100.    In May 2025, Defendant Bartlett pleaded guilty to hindering the prosecution and falsifying official records.[7]

101.    Governor Hochul called the "tragic death of Mr. Nantwi at the hands of correction officers who are responsible for protecting the incarcerated population [] deeply, deeply disturbing."[8]

### IV.    Defendants Martuscello and Hilton are Responsible for Mr. Nantwi's Fatal Beating

102.    The responsibility for Mr. Nantwi's murder extends beyond the On-Scene Defendants present at the scene of his killing.

---

[6] *See People v. Levi et al*, Indictment No. I 2025-090, Oneida Cnty. Ct. (N.Y. 2025).
[7] *See People v. Bartlett,* Case No. SCI-70480-25/001, Oneida Cnty. Ct. (N.Y 2025).
[8] Associated Press, *New York prison guards indicted in connection with an inmate's death, governor says,* CNN (April 15, 2025), https://www.cnn.com/2025/04/15/us/new-york-prison-guards-indicted-inmate-death.

103.    Defendants Martuscello and Hilton are also liable for Mr. Nantwi's death because they were each personally aware of and deliberately indifferent to the substantial risk of serious harm that correction officers posed to incarcerated individuals at Mid-State, including Mr. Nantwi.

104.    All DOCCS facilities, and Mid-State in particular, under the supervision of Defendants Martuscello and Hilton, have suffered from a longstanding pattern, practice, and custom of excessive, and sometimes fatal, force by corrections officers against incarcerated people.

105.    This longstanding pattern, practice, and custom of excessive force by corrections officers has fostered a culture of violence within DOCCS facilities, including at Mid-State, in which officers are allowed and emboldened to brutalize incarcerated individuals with impunity.

106.    A critical component of this longstanding pattern, practice, and custom of excessive force is the accompanying strict code of silence, pursuant to which corrections officers ignore or affirmatively cover up other officers' misconduct and abuse.

107.    The actions of the On-Scene Defendants against Mr. Nantwi are a direct and foreseeable result of this longstanding pattern, practice, and custom of excessive force and the resulting culture of violence within DOCCS facilities, including Mid-State.

108.    Incidents of physical violence and abuse at DOCCS facilities followed by attempted cover-ups of such violence, including at Mid-State, have been thoroughly documented, publicized, and confirmed by federal and state prosecutors, criminal and civil juries, the news media, independent research organizations, internal complaints by incarcerated people at DOCCS facilities, and numerous civil rights lawsuits.

109.    Defendants Martuscello and Hilton were each personally aware of and deliberately indifferent to this dangerous pattern, practice, and custom of excessive force by correction officers and the substantial risk of serious harm it posed to incarcerated people in DOCCS facilities, such as Mr. Nantwi.

110.    Indeed, following Mr. Nantwi's death, Defendant Martuscello admitted that DOCCS must "do better to change our culture" and that he was "committed to impactful change to end the violence within the system."[9]

111.    As of Mr. Nantwi's fatal beating, Defendants Martuscello and Hilton were each personally responsible for ensuring the safety of incarcerated individuals at Mid-State.

112.    Defendants Martuscello and Hilton had responsibility and authority to set policies, make rules, communicate expectations, issue disciplinary actions, and control the correction officers who worked at Mid-State.

113.    Despite their responsibility and authority, Defendants Martuscello and Hilton failed to enact and/or enforce policies that would have prevented attacks on incarcerated individuals like Mr. Nantwi.

114.    Despite their responsibility and authority, Defendants Martuscello and Hilton took no meaningful action to mitigate the risk of serious harm posed by the pattern, practice, and custom of excessive force against incarcerated individuals like Mr. Nantwi.

115.    As a direct and proximate result of Defendants Martuscello and Hilton's deliberate indifference to this pattern, practice, and custom of excessive force, the On-Scene Defendants brutally beat Mr. Nantwi to death.

---

[9] Conor Wight, *NYS Prison Leader Vows to Fix System After Grand Jury Says Cos Killed Another Inmate*, CNY CENTRAL (Apr. 17, 2025), https://cnycentral.com/news/i-team/nys-prison-leader-vows-to-fix-system-after-grand-jury-says-cos-killed-mid-state-inmate.

A.    **Defendants Martuscello and Hilton Were Aware of and Deliberately Indifferent to the Culture of Violence Within DOCCS Facilities**

116.    Long before Mr. Nantwi was beaten to death at Mid-State, Defendants Martuscello and Hilton knew that incarcerated individuals in DOCCS facilities, including at Mid-State, faced a substantial risk of serious harm at the hands of correction officers and took no meaningful action to address it, despite the many tools available to them to do so.

117.    By virtue of the leadership roles Defendants Martuscello and Hilton have each held within DOCCS, Defendants Martuscello and Hilton have been personally informed, briefed on, and updated about significant use of force incidents throughout DOCCS, including those described in this Complaint at paragraphs 126-335.

118.    From 2012 to 2023, Defendant Martuscello was responsible for reviewing all Office of Special Investigation ("OSI") reports and deciding whether to issue Notices of Discipline for correctional staff who physically abused incarcerated individuals.

119.    From 2012 to present, Defendant Martuscello has been personally informed of significant OSI investigations involving staff abuse and lawsuits involving abuse by correction officers, including many of the lawsuits detailed in this Complaint.

120.    As Superintendent at Mid-State, Defendant Hilton was responsible for reviewing reports of correction officer uses of force against incarcerated individuals and associated documentation to assess whether the correction officer complied with DOCCS directives.

121.    As Superintendent at Mid-State, Defendant Hilton had a variety of tools available to him to evaluate whether a particular correction officer posed a risk to inmate safety, including reviewing inmate grievances, use of force reports, unusual incident reports, the officer's human resources files, the officer's discipline documentation, and lawsuits filed against the officer.

20

122.    As Superintendent at Mid-State, Defendant Hilton had a variety of tools available to him to reduce the risk of harm that correction officers posed to incarcerated individuals including counseling, monitoring, temporary reassignment, additional training, and meeting with the individual officer and/or their supervisor.

123.    As Superintendent at Mid-State, Defendant Hilton could also initiate discipline of correction officers who physically abused an incarcerated individual through the procedures set forth in the Collective Bargaining Agreement.

124.    As a Superintendent and former Assistant DOCCS Commissioner, Defendant Hilton was personally aware of significant use of force incidents at Mid-State and throughout DOCCS, including those described in this Complaint.

125.    Defendants Martuscello and Hilton failed to employ any of the tools available to them to minimize the serious risk of harm that correction officers specifically posed to incarcerated individuals at Mid-State.

### i.   The Marshall Project and New York Times Investigation Reports Rampant Abuse Throughout DOCCS Facilities

126.    From 2015 to 2016, the Marshall Project and the New York Times conducted an extensive investigation of DOCCS facilities to examine the use of force by corrections officers at prisons across New York State (the "MP/NYT Investigation").[10]

127.    The MP/NYT Investigation concluded that a "culture of brutality has been allowed to thrive in the prisons, where a few rogue guards, often known on the cellblocks as beat-up squads, administer vigilante justice, while fellow officers look the other way."

---

[10] Michael Winerip, Michael Schwirtz and Tom Robbins, *The State That is Taking on the Prison Guards Union*, THE MARSHALL PROJECT (Apr. 11, 2016), https://www.themarshallproject.org/2016/04/11/the-state-that-is-taking-on-the-prison-guards-union.

128. The MP/NYT Investigation also noted that "[p]erhaps the biggest challenge for investigators is the culture of silence among guards."[11]

129. The findings of the MP/NYT Investigation were published in a series of New York Times articles, beginning in February 2015.

130. The New York Times articles documented numerous horrific instances of violence against incarcerated individuals across DOCCS facilities.

131. According to the MP/NYT Investigation, in 2010, Leonard Strickland, an incarcerated individual at Clinton Correctional Facility, was killed by a group of correction officers who viciously beat him and pushed him down a flight of stairs. The MP/NYT Investigation noted that this incident was consistent with "a troubling pattern of savage beatings by corrections officers at prisons across New York State and a department that rarely holds anyone accountable."[12]

132. According to the MP/NYT Investigation, in 2015, Samuel Harrell, an incarcerated individual at Fishkill Correctional Facility, was killed by the "Beat Up Squad", a group of officers notorious for committing gruesome and unjustified assaults on incarcerated people. Mr. Harrell was killed in a building at Fishkill that had been explicitly flagged to DOCCS officials as a "violent place," due to the unjustified abuse that routinely took place there.[13] The officers involved in Mr. Harrell's murder falsely claimed that Mr. Harrell had overdosed, despite the fact that Mr. Harrel's autopsy confirmed there were no illegal drugs in his system and his cause of

---

[11] *Id.*

[12] Michael Winerip & Michael Schwirtz, *An Inmate Dies, and No One Is Punished*, NEW YORK TIMES (Dec. 13, 2015), https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html.

[13] Michael Schwirtz & Michael Winerip, *Prison Guard 'Beatup Squad' is Blamed in New York Inmate's Death*, NEW YORK TIMES (Aug. 18, 2015), https://www.nytimes.com/2015/08/19/nyregion/fishkill-prison-inmate-died-after-fight-with-officers-records-show.html.

death was ruled a homicide.  Officers further falsely claimed that Mr. Harrell had assaulted them.[14]

133.    According to the MP/NYT Investigation, in 2011, George Williams, an incarcerated individual at Attica Correctional Facility, was brutally beaten by correction officers, resulting in a broken shoulder, several cracked ribs, two broken legs, a severe fracture of the orbit surrounding his left eye, a large amount of blood lodged in his left maxillary sinus, and multiple cuts and bruises.  After nearly killing Mr. Williams, the officers engaged in an elaborate cover up, falsifying official reports and destroying evidence.  The MP/NYT investigation emphasized that the assault on Mr. Williams offered "a vivid lesson in the intractable culture of prison brutality."[15]

134.    According to the MP/NYT Investigation, in 2014, Ramon Fabian, an incarcerated individual at Ulster Correctional Facility, was brutally assaulted by correction officer Michael Bukowski, who later denied any involvement in the attack and lied to investigators.[16]

135.    The MP/NYT Investigation noted a troubling pattern of officer coverups, noting that "[c]ritics including the Correctional Association of New York, a nonprofit group that monitors the state's prisons, say the episodes show that [DOCCS] has often ignored brutality."[17]

136.    According to the MP/NYT Investigation, in 2015, correction officers savagely assaulted dozens of incarcerated individuals at Clinton Correctional Facility, including beating

---

[14] *See Harrell v. N.Y. State Dep't of Corr. and Cmty. Supervision*, No. 15-cv-7065 (S.D.N.Y. Aug. 14, 2019), ECF No. 214.

[15] Tom Robbins, *A Brutal Beating Wakes Attica's Ghosts*, NEW YORK TIMES (Feb. 28, 2015), https://www.nytimes.com/2015/03/01/nyregion/attica-prison-infamous-for-bloodshed-faces-a-reckoning-as-guards-go-on-trial.html.

[16] Tom Robbins, *Guarding the Prison Guards: New York State's Troubled Disciplinary System*, NEW YORK TIMES (Sept. 27, 2015), https://www.nytimes.com/2015/09/28/nyregion/guarding-the-prison-guards-new-york-states-troubled-disciplinary-system.html.

[17] *Id.*

incarcerated individuals while they were handcuffed, choking them, and slamming them against cell bars and walls. One notoriously violent officer at Clinton, commonly known as "Captain America," tied plastic bags around incarcerated individuals' necks and tightened them until the incarcerated individual passed out.

137.    The MP/NYT Investigation reported that between 2010 and 2015, New York State paid at least $8.8 million in settlements or jury awards in cases where correction officers were accused of prisoner abuse or excessive force. The MP/NYT Investigation noted that "[a]mong those 207 cases, the names of some officers and prisons crop up repeatedly."[18]

138.    Defendant Martuscello was a DOCCS deputy commissioner at the time the MP/NYT Investigation was published and was interviewed in connection with the Investigation.

139.    Defendant Martuscello posed for photos with a New York Times photographer and told reporters that he was ready to "do anything necessary" to fight the correction officers' union.[19]

140.    Defendant Martuscello was personally aware of the contents of the MP/NYT Investigation, including the numerous instances of physical abuse documented therein.

141.    Defendants Martuscello and Hilton took no action to prevent correction officers at Mid-State from physically abusing incarcerated individuals in their custody despite their personal knowledge of the risks correction officers posed to incarcerated individuals.

---

[18] Tom Robbins, *New York State Prisons Take Steps to Track Complaints About Guards*, NEW YORK TIMES (Dec. 20, 2015), https://www.nytimes.com/2015/12/21/nyregion/new-york-state-prisons-take-steps-to-track-complaints-about-guards.html

[19] Michael Winerip, Michael Schwirtz and Tom Robbins, *The State That is Taking on the Prison Guards Union,* THE MARSHALL PROJECT (Apr. 11, 2016), https://www.themarshallproject.org/2016/04/11/the-state-that-is-taking-on-the-prison-guards-union.

*ii.   Recent Jury Verdicts, Settlements, and Criminal Pleas Reveal Persistent Physical Violence and Abuse Across DOCCS Facilities*

142.    Recent jury verdicts, settlements, pleas, and judicial findings further reveal continued incidents of excessive force and abuse against incarcerated individuals and the culture of violence that persists across DOCCS facilities.

143.    In March 2025, a Lieutenant waterboarded and violently assaulted Matthew Raymond, an incarcerated individual at Auburn Correctional Facility, while he was shackled and defenseless, inflicting permanent injuries to Mr. Raymond's genitals and bladder.  Auburn correction officers and a sergeant stood by and did nothing to stop the attack.  The officers ultimately settled the claims for $1.2 million.[20]

144.    In November 2023, a federal jury awarded the family of Terry Cooper $9.25 million in connection with his fatal beating by Clinton correction officers, who beat Cooper so severely that it caused a fatal asthma attack, deprived him of his asthma pump, and then covered up the attack and denied the use of force.[21]

145.    In 2021 and 2022, DOCCS settled three separate federal lawsuits in connection with assaults of incarcerated individuals by correction officers at Green Haven Correctional Facility.  One suit involved the brutal assault of Carlos Garcia by six officers who put him into a chokehold until he lost consciousness and then slammed his head against a wall.[22]  The second suit involved three separate assaults on Benjamin Stephens by nine officers who choked him and smashed his head so hard that he had seizure.[23]  The third suit involved an assault of Nakia Rose

---

[20] *See Raymond v. Mitchell*, No. 18-cv-1467 (N.D.N.Y., Mar. 1, 2019), ECF Nos. 20, 201.

[21] *See Cooper v. Clancy*, Case No. 9:19-cv-00362 (N.D.N.Y. Nov. 23, 2023), ECF Nos. 52, 226.

[22] *See Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y Feb. 7. 2022), ECF No. 101.

[23] *See Stephens v. Venetozzi*, No. 13-cv-5779 (S.D.N.Y. Feb. 7, 2022), ECF. No. 381.

by five officers who, at a sergeant's direction, handcuffed Mr. Rose, brought him to the floor, kicked and punched him and twisted his ankles.[24]

146.    In July 2022, Aaron Finn, a correction officer at Green Haven, pled guilty to violating 18 U.S.C. § 242 in connection with the brutal beating of Melvin Virgil.[25]  Officer Finn handcuffed Mr. Virgil and repeatedly smashed his head into a wall and steel bars as other officers silently watched.  Multiple officers fabricated reports of misconduct against Mr. Virgil.[26]

147.    In April 2021, three correction officers at Fishkill Correctional Facility attacked Nicholas Magalios, holding him down and brutally kicking and punching him while other officers looked on and did nothing to intervene.  Magalios suffered significant bruising, marks, abrasions, lacerations and aggravation of a pre-existing shoulder injury, which required surgery. The officers involved were found to have created false reports and given false testimony, denying the use of any force against Mr. Magalios.  A jury awarded Mr. Magalios $1 million.[27]  The Court stated that the officers' "conduct seems to be all too acceptable among certain employees of New York's prison system" and that "similar acts often go undetected in correctional facilities."

148.    In May 2020, correction officers at Sullivan Correctional Facility settled excessive force claims against them for $5 million in connection with the fatal assault of Karl Taylor.[28]

149.    In February 2020, a jury awarded Jerome Anderson $650,000 after finding a sergeant and three officers at Green Haven liable for excessive force.[29]  The officers coordinated

---

[24] *See Rose v. Garritt*, No. 16-cv-3624 (S.D.N.Y. July 30, 2021), ECF No. 128.
[25] *United States v. Finn*, No. 7:21-cr-00650-NSR (S.D.N.Y Oct. 26, 2022), ECF No. 28.
[26] *See Virgil v. Finn*, No. 22-cv-3169 (S.D.N.Y. Mar. 24, 2023), ECF No. 74.
[27] *Magalios v. Peralta*, No. 19-CV-6188 (CS), 2022 WL 407403, at *7 (S.D.N.Y. Feb. 10, 2022), *aff'd*, No. 22-519-PR, 2023 WL 4618349 (2d Cir. July 19, 2023).
[28] *See Ramsay-Nobles v. Keyser*, No. 16-cv-5778 (S.D.N.Y. May 5, 2020), ECF No. 429.
[29] *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Feb. 24, 2020), ECF Nos. 133, 161.

an attack on Mr. Anderson by taking him to an area lacking surveillance where they punched, stomped, and kicked him for several minutes.

150.    In 2013, correction officers at Downstate Correctional Facility brutally beat Kevin Moore, breaking his ribs and facial bones and ripping one of his dreadlocks out of his head.  As a result of the beating, Mr. Moore was hospitalized for 17 days.  On September 21, 2016, then-United States Attorney Preet Bharara announced federal charges against five of the officers involved in the attack on Moore, including separate charges related to the use of excessive force and filing of false reports.[30]  Mr. Bahara noted that "excessive use of force in prisons . . . has reached crisis proportions in New York State."[31]  All five officers involved in Mr. Moore beating were criminally convicted.

151.    Since approximately 2017, Defendant Martuscello was made personally aware of significant legal cases like these, including settlements and jury verdicts involving allegations of excessive force by DOCCS staff as well as criminal charges brought against correction officers involving excessive force and cover ups.

152.    Several times per week, CANY also directly notifies DOCCS and other state agencies about allegations of abuse, maltreatment, neglect, or violations carried out by staff in New York's prisons.[32]

---

[30] Press Release, *Five Correction Officers Charged With Federal Crimes In Beating Of Inmate At Downstate Correctional Facility And Cover-Up*, U.S. DEP'T OF JUSTICE (Sept. 21, 2016), https://www.justice.gov/usao-sdny/pr/five-correction-officers-charged-federal-crimes-beating-inmate-downstate-correctional.
[31] Michael Winerip & Michael Schwirtz, *Five New York Prison Guards Charged in '13 Beating of Inmate*, NEW YORK TIMES (Sept. 21, 2016), https://www.nytimes.com/2016/09/22/nyregion/new-york-officers-downstate-correctional-facility-inmate-beating.html
[32] *CANY Statement on the Death of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 23, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy

### iii.   A Second Marshall Project and New York Times Investigation Reports Pervasive Pattern of Coverups Across DOCCS Facilities

153.    In 2023, the Marshall Project and the New York Times conducted another investigation of DOCCS facilities, focused on an analysis of 5,600 DOCCS disciplinary records dating back to 2010 (the "MP/NYT Disciplinary Record Investigation").[33]

154.    The MP/NYT Disciplinary Record Investigation concluded that staff cover ups of excessive force incidents are commonplace across DOCCS facilities.

155.    The records revealed that correction officers typically "work in groups to conceal violent assaults by lying to investigators and on official reports, and then they file charges against their victims and have them sent to solitary."[34]

156.    Defendant Martuscello was interviewed in connection with the 2023 MP/NYT Disciplinary Record Investigation.

157.    Defendant Martuscello stated that he was not surprised that false reports often accompany instances of excessive force, noting that "[t]here has to be some manipulation of facts."[35]

158.    Consistent with its general practice, prior to publishing the MP/NYT Investigation, the Marshall Project sent a "findings letter" to DOCCS, outlining the findings of its investigation.

---

[33] Alysia Santo, Joseph Neff, and Tom Meagher, *Guards Brutally Beat Prisoners and Lied About it. They Weren't Fired*, N.Y. TIMES (May 25, 2023), https://www.nytimes.com/2023/05/19/nyregion/ny-prison-guards-brutality-fired.html; Alysia Santo and Joseph Neff, *We Spent Two Years Investigating Abuse by Prison Guards in new York. Here are Five Takeaways,* THE MARSHALL PROJECT (May 22, 2023), https://www.themarshallproject.org/2023/05/22/new-york-prison-corrections-officer-discipline-findings.
[34] Alysia Santo & Joseph Neff, *We Spent Two Years Investigating Abuse by Prison Guards in New York. Here are Five Takeaways*, THE MARSHALL PROJECT (May 22, 2023), https://www.themarshallproject.org/2023/05/22/new-york-prison-corrections-officer-discipline-findings.
[35] Joseph Neff, Alysia Santo, and Tom Meagher, *How a 'Blue Wall' Inside New York State Prisons Protects Abusive Guards*, THE MARSHALL PROJECT (May 22, 2023), https://www.themarshallproject.org/2023/05/22/new-york-prison-corrections-officer-abuse-cover-up.

159.    Accordingly, Defendant Martuscello was personally aware of the contents of the MP/NYT Disciplinary Record Investigation, including the numerous instances of staff cover ups documented therein.

160.    Defendants Martuscello and Hilton took no action to prevent correction officers from covering up excessive force incidents in this precise manner.  As a result, correction officers at all DOCCS facilities, including at Mid-State, are emboldened to conceal their unlawful conduct by filing false reports.

161.    Defendant Martuscello was familiar with all the news reports described in this Complaint, including the MP/NYT Investigative reports discussed herein.

162.    As a member of the DOCCS Executive Team, Defendant Martuscello was provided with news clips containing information about DOCCS, that would contain articles like the ones described in this Compliant.

163.    As the Superintendent of Mid-State and former Assistant Commissioner, Defendant Hilton was also familiar with all the news reports described in this Complaint, including the Marshall Project/New York Times Investigative reports discussed herein.

> ### iv.    Prisoners' Rights Advocates Warned Defendants Martuscello and Hilton of the Risk of Violence Against Incarcerated Individuals

164.    Since at least 2022, New York state prisoners' rights advocates have held quarterly conference calls with Defendant Martuscello to discuss issues pertaining to DOCCS.[36]

165.    On every quarterly conference call with Defendant Martuscello since approximately 2022, advocates have voiced their concerns about the continual assaults and beatings of incarcerated individuals in DOCCS facilities.

---

[36] JB Nicholas, *NY Prison Chief Ignored 'Ticking Time-Bomb' 3 ½ Months Before Guards Killed Robert Brooks*, THE FREE LANCE (Feb. 10, 2025), https://www.thefreelancenews.org/home/ny-prison-chief-ignored-ticking-time-bomb-3-12-months-before-guards-killed-robert-brooks.

166. During one of these conference calls in early 2024, Tyrell Muhammad, a Senior Advocate at the Alliance of Families for Justice, explicitly warned Defendant Martuscello that the spiraling violence by correction officers was a "ticking time-bomb" and would soon result in an incarcerated individual's death.[37]

167. Defendant Martuscello dismissed these concerns.

168. On August 27, 2024, prisoners' rights advocates met face-to-face with Defendant Martuscello again to discuss the rampant abuse of incarcerated individuals.

169. Defendant Martuscello dismissed advocates' warnings and pleas to address the culture of abuse and downplayed the violence by staff.

170. In dismissing advocates' concerns, Defendant Martuscello stated that there were "too many cameras inside the prisons" for staff abuse to occur.[38]

171. Three-and-a-half months later, Robert Brooks was tortured and killed by correction officers at Marcy Correctional Facility, on video.

172. Less than three months after Mr. Brooks was killed, Mr. Nantwi was beaten to death at Mid-State Correctional Facility.

173. Defendant Martuscello was personally informed of the serious risk of harm to individuals like Mr. Brooks and Mr. Nantwi only months before each were savagely killed by DOCCS correction officers.

174. Notwithstanding this knowledge, Defendant Martuscello was deliberately indifferent to the risk of serious harm to incarcerated individuals at Mid-State, like Mr. Nantwi, and took no meaningful action to mitigate the risk.

---

[37] *Id.*
[38] *Id*.

**B.     Defendants Martuscello and Hilton Were Aware of and Deliberately Indifferent to Decades of Rampant Violence by Correction Officers at Mid-State**

175.     Even before Mr. Nantwi was beaten to death by the On-Scene Defendants, Defendants Martuscello and Hilton were personally aware of the serious risk of harm that correction officers specifically posed to incarcerated individuals at Mid-State.

176.     For decades, the rampant and unchecked abuse of incarcerated individuals at Mid-State has been thoroughly documented and publicized through the news media, independent research organizations, internal complaints by Mid-State incarcerated individuals, and numerous civil rights lawsuits.

177.     It is this culture of violence and brutality at Mid-State—and across all DOCCS facilities—that allowed Mr. Nantwi's fatal beating to occur.

178.     Defendants Martuscello and Hilton were aware of the pattern, practice, and custom of the use of excessive force against incarcerated people and their associated cover ups and, despite their knowledge and power as key policymakers at DOCCS and Mid-State, respectively, they failed to enact and enforce policies that would have prevented such attacks, including the fatal beating of Mr. Nantwi.

179.     Defendants Martuscello and Hilton were also on notice of the massive number of instances of excessive force and cover ups that were taking place at Mid-State, and that were a constant part of the facility's culture, custom, and practice.

180.     Defendants Martuscello and Hilton had a variety of tools available to them to reduce the risk of harm that Mid-State correction officers posed to incarcerated individuals including counseling, monitoring, temporary reassignment, additional training, pursuing

31

discipline, and meeting with the individual officer and/or their supervisor to discuss the use of force.

181.    Defendants Martuscello and Hilton took no action to prevent correction officers at Mid-State from physically abusing incarcerated individuals in their custody.

### *i.    Thirty Correction Officers Conduct a Violent Raid at Mid-State in 2016*

182.    In July 2016, approximately thirty correction officers conducted an extensive and violent raid of the 4H Housing Unit at Mid-State.[39]

183.    The purpose of the raid was purportedly to locate a weapon that officers believed had been used by incarcerated individual to assault a correction officer three days earlier and to send a message to the incarcerated individuals that further assaults would not be tolerated.[40]

184.    Supervisory staff, including then-Superintendent Joseph Ward, condoned and oversaw the violent raid and use of excessive force by correction officers.[41]

185.    Then-Superintendent Joseph Ward and the Deputy Superintendent of Security instructed officers to "make it clear to the 4H residents 'you don't touch staff.'"[42]

186.    Officers and supervisors, including Defendant Slawson, savagely assaulted twenty-eight incarcerated individuals at Mid-State, "indiscriminately kicking, punching, stomping, or slamming them."[43]

187.    During the raid, correction officers also sexually assaulted three incarcerated individuals, including inserting objects into two incarcerated individuals' rectums.[44]

---

[39] *Aliaga v. State of New York*, 84 Misc.3d 1246(A) (2024)
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

188.    Supervisors, including then-Superintendent Ward and other senior staff, were present at various points during the raid, "observing the damage to the dorm and appearing pleased with the result."[45]

189.    On December 2, 2024, following a lengthy trial on liability in the New York Court of Claims, the court held that there was "no justification for the excessive and unreasonable use of force" against these incarcerated individuals on July 6, 2016.[46]

190.    The Court further held that this raid had been "condoned by the highest levels of prison administration."[47]

191.    Following the raid, OSI conducted an investigation, resulting in disciplinary actions against several officers and supervisors.

192.    The then-Deputy Superintendent of Security at Mid-State was disciplined because he was "the high-ranking supervisor [and] he should have made sure that things were done differently."[48]

193.    Then-Superintendent Ward was never disciplined for the raid because he resigned.[49]

194.    Defendants Martuscello and Hilton were aware of the Court of Claims' December 2024 finding that over thirty Mid-State correction officers, including Defendant Slawson, had used excessive force against incarcerated individuals in 2016 and accordingly posed a continued serious risk of harm against current incarcerated individuals at Mid-State.

---

[45] *Id.*
[46] *Id*.
[47] *Id.*
[48] *Id*
[49] *Id.*

195.    Defendants Martuscello and Hilton took no action following the Court of Claims'
December 2024 finding to ensure that correction officers at Mid-State never engaged in the same
type of physical violence or abuse again.

### ii. CANY's 2023 Monitoring Report Details Widespread Physical Abuse by Staff at Mid-State

196.    In October 2022, CANY conducted a comprehensive monitoring visit to Mid-
State, which included meetings with prison staff and 122 interviews with incarcerated
individuals.[50]

197.    On July 5, 2023, CANY issued a report documenting its findings and conclusions
stemming from its monitoring visit.

198.    The CANY report recorded incidents of "routine – and sometimes racialized –
abuse by staff, including physical assaults, and observations of a retaliatory environment."[51]

199.    The CANY report also noted that the "most prominent open-ended finding for
people in the general population [at Mid-State] was that of violence and abuse by security staff"
and that "physical abuse was regular and expected" at Mid-State.[52]

200.    According to the CANY report, one incarcerated individual described the
environment: "You are at the whims of the guards. They can aggressively search you, beat you
up and ignore you when you try to get their attention."[53]

---

[50]*New Report: Staff Abuses Surfaced in Correctional Association's Monitoring Visits to Central NY Prison,* CORRECTIONAL ASSOCIATION OF NEW YORK, https://www.correctionalassociation.org/press-releases-archive/2023-midstate-pvb-release.

[51] *Post-Visit Briefing & Recommendations No. 22-11: Monitoring Visit to Mid-State Correctional Facility - October 13-14, 2022*, CORRECTIONAL ASSOCIATION OF NEW YORK, https://www.correctionalassociation.org/postvisit-briefing-recommendations/2023-11-midstate.

[52] *Id.*

[53] *Id.*

201.    According to CANY's report, incarcerated individuals "reported physical assaults, threats, and treatment by staff, in addition to day-to-day experiences of poor treatment and dehumanization in interactions. People described their interactions with staff as demeaning and fearful."[54]

202.    CANY's report of rampant physical abuse by corrections officers at Mid-State was by no means an anomaly for DOCCS facilities.

203.    CANY Executive Director Jennifer Scaife noted that CANY's "monitoring at Mid-State Correctional Facility highlighted troubling issues we have documented in many of the state's prisons."[55]

204.    CANY's report also highlighted Mid-State's failure to require its correction officers to wear body cameras.

205.    CANY reported that although "Mid-State had a supply of 250 body cameras", the facility "only used 30 at a time, and only issued them to sergeants."[56]

206.    According to the CANY report, Mid-State was scheduled for installation of between 1,500 to 1,700 stationary cameras, but, for inexplicable reasons, the date of installation was unknown.[57]

207.    CANY's report included a list of recommendations to DOCCS, stemming from their investigation and visit to Mid-State.

---

[54] *Id.*

[55] *New Report: Staff Abuses Surfaced in Correctional Association's Monitoring Visits to Central NY Prison,* CORRECTIONAL ASSOCIATION OF NEW YORK, https://www.correctionalassociation.org/press-releases-archive/2023-midstate-pvb-release.

[56] *Post-Visit Briefing & Recommendations No. 22-11: Monitoring Visit to Mid-State Correctional Facility - October 13-14, 2022,* CORRECTIONAL ASSOCIATION OF NEW YORK, https://www.correctionalassociation.org/postvisit-briefing-recommendations/2023-11-midstate.

[57] *Id.*

208.    One of CANY's primary recommendations was that "DOCCS should investigate and address the reports of abuse of incarcerated people by staff."[58]

209.    Defendants Martuscello and Hilton were aware of the contents of CANY's July 2023 report regarding conditions at Mid-State and the recommendations included therein, including the reports of physical violence by staff.

210.    Following a visit to a DOCCS facility, it is CANY's standard practice to provide a summary of its findings, concerns, and impressions to the facility's superintendent and the DOCCS Commissioner via email.

211.    Following the monitoring visit to Mid-State in October 2022, CANY provided this summary about its findings, concerns and impressions via email to the Mid-State Superintendent and DOCCS Commissioner.

212.    In July 2023, pursuant to standard practice, CANY provided its final published report to the acting DOCCS Commissioner, Defendant Martuscello.

213.    As acting DOCCS Commissioner in July 2023, Defendant Martuscello was expected to review CANY's July 2023 report and take appropriate steps to protect the safety of incarcerated individuals at Mid-State.

214.    As Superintendent of Mid-State, Defendant Hilton was expected to review CANY's July 2023 report and take appropriate steps to protect the safety of incarcerated individuals at Mid-State.

215.    Following CANY's July 2023 report, Defendants Martuscello and Hilton took no steps to address or prevent continued staff violence against incarcerated individuals at Mid-State.

---

[58] *Id.*

### iii. *Correction Officers Brutally Beat James Barton at Mid-State in 2023*

216.    The 2023 attack on James Barton, an incarcerated individual at Mid-State, corroborated CANY's findings about Mid-State and reflects the longstanding pattern, practice, and custom of excessive force by correction officers against incarcerated individuals at Mid-State.

217.    On April 13, 2023, Mid-State correction officers Rohail Khan, Brandon Montanari, and trainee Michael Williams, among others, brutally beat Mr. Barton.[59]

218.    The attack on Mr. Barton was unprovoked and wholly unjustified.

219.    The officers woke Mr. Barton up shortly after midnight, took him to a hallway outside his unit, and ordered him to hold his identification card against the wall.[60]

220.    Officers proceeded to punch and kick Mr. Barton in his head, face, eyes, chest, back, stomach, legs, buttocks, and groin for approximately ten minutes until he fell to the floor.[61]

221.    During the assault, one of the officers yelled "Let's give him the George Floyd challenge."  Officers proceeded to put Mr. Barton in a chokehold while other officers beat him and kicked him.[62]

222.    The officers then agreed to lie about their use of force and to deny involvement or knowledge of the incident to investigators.

---

[59] *See* Brendan J. Lyons, 'Give him the George Floyd challenge': Officers Admit Beating Inmate, TIMES UNION (Apr. 24, 2025), https://www.timesunion.com/capitol/article/three-correction-officer-admit-beating-black-20292083.php; Gary Craig, *NY Prison Officers Allegedly Beat, Choked Inmate in a 'George Floyd Challenge'*, THE DEMOCRAT AND CHRONICLE (Jan. 7, 2025), https://www.democratandchronicle.com/story/news/2025/01/07/james-barton-beaten-by-two-officers-at-mid-state-correctional-facility-new-york-lawsuit-alleges/77427432007/.
[60] *Id.*
[61] *Id.*
[62] *Id.*

223.    In October 2024, Officers Khan and Williams pled guilty to deprivation of rights under color of law in violation of 18 U.S.C. § 242 for the brutal beating of Mr. Barton.[63]

224.    In connection with Mr. Barton's beating, DOCCS officials made a statement via email, indicating that "[d]iscipline has been initiated with some staff terminated already and two people have been convicted of federal crimes so far."[64]

225.    DOCCS officials also stated that it helped federal prosecutors build their case against the officers.

226.    Defendants Martuscello and Hilton were personally aware of Mr. Barton's beating by Mid-State correction officers in April 2023.

227.    In light of Mr. Barton's beating, which was in no way an aberration, Defendants Martuscello and Hilton were personally aware of the substantial risk of serious harm that correction officers posed to other incarcerated people at Mid-State.

228.    Between the date of Mr. Barton's assault and Mr. Nantwi's fatal beating, Defendants Martuscello and Hilton took no meaningful action to prevent Mr. Nantwi from facing a similar brutal attack by Mid-State correction officers.

229.    Defendants Martuscello and Hilton had a variety of tools available to them to evaluate whether a particular correction officer posed a risk to inmate safety, including reviewing inmate grievances, the officer's use of force reports, the officer's unusual incident reports, the officer's human resources files, the officer's discipline documentation, and lawsuits filed against the officer.

---

[63] *See United States v. Khan*, No. 5:24-CR-391 (N.D.N.Y. Oct. 29, 2024), ECF No. 4; *United States v. Williams*, No. 5:24-cr-00323 (N.D.N.Y. Oct. 23, 2024), ECF No. 5.
[64] Gary Craig, *NY Prison Officers Allegedly Beat, Choked Inmate in a 'George Floyd Challenge'*, THE DEMOCRAT AND CHRONICLE (Jan. 7, 2025), https://www.democratandchronicle.com/story/news/2025/01/07/james-barton-beaten-by-two-officers-at-mid-state-correctional-facility-new-york-lawsuit-alleges/77427432007/.

230.    Defendants Martuscello and Hilton had a variety of tools available to them to reduce the risk of harm that correction officers posed to incarcerated individuals including observing and correcting staff, mentoring, counseling, temporary reassignment, additional training, pursuing discipline, reviewing the officer's past work history and discipline, and speaking with the individual officer and/or their supervisor about their use of force.

231.    Between the date of Mr. Barton's assault and Mr. Nantwi's fatal beating, Defendants Martuscello and Hilton failed to employ any of these tools to prevent Mr. Nantwi from facing a similar brutal attack by Mid-State correction officers.

### iv.  Defendant Levi Assaults Shayzon Taylor at Mid-State in 2023

232.    The attack on Shayzon Taylor, another incarcerated individual at Mid-State, in September 2023 corroborates CANY's findings about Mid-State and reflects the longstanding pattern, practice, and custom of excessive force by corrections officers against incarcerated people at Mid-State.

233.    In September 2023—only five months after Mr. Barton's beating—Defendant Levi and three other correction officers brutally beat Mr. Taylor.[65]

234.    As a result of his beating, Mr. Taylor was taken to the hospital and treated for severe injuries.

235.    In May 2024, Defendant Levi was put on a 12-month disciplinary evaluation, lasting through May 2025, for the use of excessive physical force against Mr. Taylor.[66]

236.    Accordingly, Defendant Levi was still in his disciplinary period stemming from his beating of Mr. Taylor when he savagely beat Mr. Nantwi to death on March 1, 2025.

---

[65] Kumi Tucker, *Amsterdam Woman: CO Charged with Murder Also Beat Her Husband*, WNYT (May 5, 2025), https://wnyt.com/top-stories/amsterdam-woman-co-charged-with-murder-also-beat-her-husband/.
[66] *Id.*

237.    Defendants Martuscello and Hilton were aware of Mr. Taylor's beating by Mid-State correction officers in 2023.

238.    Defendants Martuscello and Hilton were aware of and involved in the decision to place Defendant Levi on a twelve-month disciplinary period in May 2024.

239.    In light of Mr. Taylor's beating, which occurred only five months after Mr. Barton's beating, Defendants Martuscello and Hilton were aware of the specific risk of serious harm posed by Defendant Levi.

240.    Notwithstanding that Defendant Levi was placed on a twelve-month disciplinary period, Defendants Martuscello and Hilton failed to take any further steps to ensure that Defendant Levi did not pose a risk of harm to other incarcerated individuals at Mid-State, including observing and monitoring Defendant Levi's treatment of incarcerated individuals, meeting with Defendant Levi to discuss his uses of force, providing mentoring, counseling, or additional training for Defendant Levi, or evaluating Defendant Levi's fitness for duty.

241.    In light of Mr. Taylor's beating, Defendants Martuscello and Hilton were also aware of and deliberately indifferent to the substantial risk of serious harm that other Mid-State correction officers posed to other incarcerated individuals at Mid-State.

242.    Between the date of Mr. Taylor's assault and Mr. Nantwi's fatal beating, Defendants Martuscello and Hilton took no meaningful action to prevent Mr. Nantwi from facing a similar brutal attack by Mid-State correction officers, including Defendant Levi.

243.    Defendants Martuscello and Hilton had a variety of tools available to them to evaluate whether a particular correction officer posed a risk to inmate safety, including reviewing inmate grievances, the officer's use of force reports, the officer's unusual incident reports, the

officer's human resources files, the officer's discipline documentation, and lawsuits filed against the officer.

244.    Defendants Martuscello and Hilton had a variety of tools available to them to reduce the risk of harm that correction officers posed to incarcerated individuals including observing and correcting staff, mentoring, counseling, temporary reassignment, additional training, pursuing discipline, reviewing the officer's past work history and discipline, and speaking with the individual officer and/or their supervisor about their use of force.

245.    Between the date of Mr. Taylor's assault and Mr. Nantwi's fatal beating, Defendant Hilton failed to employ any of these tools to prevent Mr. Nantwi from facing a similar brutal attack by Mid-State correction officers.

### v. CANY's 2025 Report Details Continued Physical Abuse by Staff at Mid-State

246.    On January 27, 2025—only *33 days* before Mr. Nantwi was killed on March 1, 2025—CANY conducted a second monitoring visit to Mid-State.  This visit came a month after correction officers had murdered Robert Brooks at Marcy Correctional Facility, just across the street.

247.    Following its visit, CANY reiterated its "serious concerns about operational failures at Mid-State" to DOCCS officials.[67]

248.    CANY reported that conditions at Mid-State had deteriorated considerably since its monitoring visit in October 2022.[68]

---

[67] *CANY Statement in Response to Death of Incarcerated Individual at Mid-State Correctional Facility*, CORRECTIONAL ASSOCIATION OF N.Y. (March 4, 2025), https://www.correctionalassociation.org/press-releases-archive/correctional-association-of-new-york-cany-statement-in-response-to-death-of-incarcerated-individual-at-mid-state-correctional-facility.
[68] *Id.*

41

249.    According to CANY's statement, the project to install 1,500 to 1,700 fixed surveillance cameras throughout the Mid-State facility had not advanced *at all* in the more than two years since its initial visit in 2022.[69]

250.    CANY reported that incarcerated individuals at Mid-State continued to recount "specific incidents of violence and abuse by correctional officers."[70]

251.    CANY reported that incarcerated individuals at Mid-State described a "general lack of accountability throughout the facility, resulting in fundamental breakdowns in trust and the functioning of essential services, including medical care."[71]

252.    CANY noted that Mid-State was "not well-equipped to manage" its "large population of individuals with complex needs."[72]

253.    Defendants Martuscello and Hilton were personally aware of the contents of CANY's statement detailing its concerns about Mid-State in January 2025.

254.    Consistent with CANY's standard practice, on January 27, 2025, CANY reported its findings and concerns about Mid-State directly to Defendant Martuscello via email.

255.    As DOCCS Commissioner, Defendant Martuscello was expected to read CANY's email detailing its concerns about Mid-State and take appropriate steps to protect the safety of incarcerated individuals at Mid-State.

256.    As DOCCS Commissioner, Defendant Martuscello was expected to share CANY's concerns about Mid-State with DOCCS senior officials at Mid-State, including Defendant Hilton.

---

[69] *Id.*
[70] *Id.*
[71] *Id*.
[72] *Id.*

257.    As Superintendent of Mid-State, Defendant Hilton was expected to review CANY's concerns about Mid-State and take appropriate steps to protect the safety of incarcerated individuals at Mid-State.

258.    Following CANY's January 2025 statement, Defendants Martuscello and Hilton took no steps to meaningfully address or prevent continued staff violence against incarcerated individuals at Mid-State.

### vi.    Defendants Chandler and Bartlett Assault Christopher Quiles at Mid-State One Day Before Mr. Nantwi Is Killed

259.    The attack on Christopher Quiles, another incarcerated individual at Mid-State, on February 28, 2025 corroborates CANY's findings about Mid-State and reflects the longstanding pattern, practice, and custom of excessive force by correction officers against incarcerated people at Mid-State.

260.    On February 28, 2025—*one day* before Mr. Nantwi was fatally beaten—multiple officers on the Mid-State CERT team, including Defendants Chandler and Bartlett, brutally attacked Mr. Quiles.[73]

261.    The officers, including Defendants Chandler and Bartlett, beat Mr. Quiles' body, face, and head with their fists and batons.[74]

262.    The officers, including Defendants Chandler and Bartlett, pepper sprayed Mr. Quiles in the course of their assault on him.[75]

---

[73] *New Details Uncovered in New York State Prison Beating Scandal,* NBC NEW YORK (May 1, 2025), https://www.nbcnewyork.com/on-air/as-seen-on/new-details-uncovered-in-new-york-state-prison-beating-scandal/6247591/?amp=1.
[74] *Id.*
[75] *Id.*

263.    The officers, including Defendants Chandler and Bartlett, used a hot pipe to burn Mr. Quiles in the course of their attack, resulting in Mr. Quiles suffering third-degree burns.[76]

264.    None of the officers involved in Mr. Quiles' beating, including Defendants Chandler and Bartlett, were wearing body cameras, despite being required to do so.[77]

265.    Defendants Martuscello and Hilton were each aware of Mr. Quiles' beating by Mid-State correction officers on February 28, 2025.

266.    On February 28, 2025, Mr. Quiles' aunt wrote directly to Defendant Hilton and Defendant Martuscello to report the incident and demand that corrective action be taken.[78]

267.    On February 28, 2025, Defendant Hilton falsely reported to Mr. Quiles' aunt that Mr. Quiles had not been injured.[79]

268.    In light of Mr. Quiles' beating, which occurred only *one day* before Mr. Nantwi's fatal beating, Defendants Martuscello and Hilton were personally aware of and deliberately indifferent to the substantial risk of serious harm that Mid-State correction officers posed to incarcerated people at Mid-State, including Mr. Nantwi.

269.    Defendants Hilton and Martuscello were also personally aware of the specific risk of serious harm that Defendants Chandler and Bartlett posed to incarcerated people at Mid-State.

270.    Between the date of Mr. Quiles' assault and Mr. Nantwi's fatal beating, Defendants Martuscello and Hilton took no meaningful action to prevent Mr. Nantwi from facing a similar brutal attack by any Mid-State correction officers, including Defendants Chandler and Bartlett.

---

[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*

271.    Defendants Martuscello and Hilton had a variety of tools available to them to evaluate whether a particular correction officer posed a risk to inmate safety, including reviewing inmate grievances, the officer's use of force reports, the officer's unusual incident reports, the officer's human resources files, the officer's discipline documentation, and lawsuits filed against the officer.

272.    Defendants Martuscello and Hilton had a variety of tools available to them to reduce the risk of harm that correction officers posed to incarcerated individuals including observing and correcting staff, mentoring, counseling, temporary reassignment, additional training, pursuing discipline, reviewing the officer's past work history and discipline, and speaking with the individual officer and/or their supervisor about their use of force.

273.    Between the date of Mr. Quiles' assault and Mr. Nantwi's fatal beating, Defendant Hilton failed to employ any of these tools to prevent Mr. Nantwi from facing a similar brutal attack by Mid-State correction officers.

**C.    Defendants Martuscello and Hilton Were Aware that Correction Officers Had Fatally Beaten Robert Brooks Only Three Months Earlier**

274.    On December 9, 2024, fourteen correction officers at Marcy Correctional Facility sadistically beat Robert Brooks to death.[80]

275.    Marcy Correctional Facility is directly across the street from Mid-State Correctional Facility in Marcy, New York.

276.    Mr. Brooks' savage beating was recorded on several of the correction officers' body cameras, without their knowledge.

---

[80] *See Brooks v. Farina et al.*, No. 25-cv-0068 (N.D.N.Y. 2025).

277.    Over the course of ten minutes, at least six correction officers can be seen repeatedly punching, kicking, and attacking Mr. Brooks while he remains handcuffed, restrained, and utterly defenseless.[81]

278.    One officer can be seen lifting Mr. Brooks by the neck using a chokehold while other officers continued to beat him.[82]

279.    Another officer is seen repeatedly hammering Mr. Brooks with the heel of a shoe.[83]

280.    At least nine other officers can be seen standing by, watching Mr. Brooks get beaten to death.[84]

281.    The officers standing by appear to be completely unfazed by the horror that they are witnessing.

282.    Some officers even appear to be amused, visibly smiling, or laughing as Mr. Brooks is tortured to death.[85]

283.    The recording of Mr. Brooks' murder provides a terrifying and up-close view of the dangerous reality that incarcerated individuals at DOCCS facilities face on a day-to-day basis.

284.    The recording of Mr. Brooks' murder also confirms the pattern and practice of rampant abuse within DOCCS facilities that incarcerated individuals have reported and that CANY has documented and warned about for years.

---

[81] *Id.*
[82] *Id.*
[83] *Id*.
[84] *Id.*
[85] *Id.*

285.    Defendants Martuscello and Hilton were aware that correction officers at Marcy had beaten Mr. Brooks to death on December 9, 2024.

286.    On February 13, 2025, Defendant Martuscello issued a public statement that watching the video of Mr. Brooks' killing made him feel "deeply repulsed and nauseated."[86]

287.    Defendant Martuscello acknowledged that there was "no excuse" for the officers' actions and recognized the need for "institutional change" to prevent similar incidents in the future.[87]

288.    But Defendant Martuscello was aware of the need for "institutional change" to address the culture of violence within DOCCS facilities long before Mr. Brooks was killed in December 2024.

289.    As alleged in this Complaint, numerous prisoners' rights advocates had personally warned Defendant Martuscello of this precise risk only three months before Mr. Brooks' death.

290.    Defendant Martuscello was personally aware, through internal complaints by incarcerated individuals, a multitude of civil rights lawsuits, reports by independent research organizations, the news media, and federal and state prosecutors, many of which are alleged in this Complaint, of numerous other incidents of violence by correction officers against incarcerated individuals in DOCCS facilities.

291.    Notwithstanding, Defendant Martuscello has been deliberately indifferent to the culture of violence and abuse by correction officers in DOCCS facilities and the resulting significant and ongoing risk of harm posed to incarcerated individuals.

---

[86] Ed Shanahan, *Video Shows Prison Officers' Fatal Assault of Inmate in 'Shocking' Detail*, N.Y. TIMES (Dec. 27, 2024), https://www.nytimes.com/2024/12/27/nyregion/marcy-correctional-inmate-death-video-ny-prison.html.
[87] Erik Ortiz, *'Shocking' Bodycam Video Released of New York Officers Fatally Beating Prisoner*, NBC NEWS (Dec. 27, 2024), https://www.nbcnews.com/news/us-news/shocking-bodycam-video-released-new-york-officers-fatally-beating-pris-rcna185537.

292.    Following Mr. Brooks' murder, Defendant Martuscello pledged to prevent "this type of behavior" from recurring within DOCCS facilities and to investigate the entire department "to identify places where we can improve and make changes."[88]

293.    But less than three months later, Mr. Nantwi was tortured and murdered in a strikingly similar way less than one mile away.

294.    On February 11, 2025, in the wake of Mr. Brooks' death, DOCCS updated its policies to require DOCCS correction officers to wear and activate their provided body worn cameras ("BWC") during the duration of their shift (the "BWC Directive").[89]

295.    Pursuant to the BWC Directive, regardless of the presence of fixed cameras, correction officers who have been issued BWCs are required to manually activate them when "interacting with an incarcerated individual or visitor in any location," when "the employee observes unauthorized activity by an incarcerated individual, a DOCCS employee, or any other person in the facility," and when "the employee is responding to an emergency call for assistance (e.g., personal alarm activations, medical emergencies, disturbances in any area of the facility)."[90]

296.    Pursuant to the BWC Directive, body worn cameras must be worn on an officer's "upper front torso of the uniform/clothing, attached to the outermost layer of clothing, and positioned forward to facilitate an unobstructed field of view."[91]

---

[88]Alecia Solorzano, *NYS AG releases bodycam footage amidst investigation into inmate death after encounter at Marcy Correctional Facility*, WENY NEWS (Dec. 27, 2024), https://www.weny.com/story/52078963/nys-ag-releases-bodycam-footage-amidst-investigation-into-inmate-death-after-encounter-at-marcy-correctional-facility.

[89] N.Y. State Dep't of Corr. and Cmty. Supervision, *Directive: Body-Worn Camera (BWC)*, https://doccs.ny.gov/system/files/documents/2025/02/4943.pdf.

[90] *Id.*

[91] *Id.*

297.     Pursuant to the Directive, "all uniformed staff shall be trained in the wearing and operation of the BWC."[92]

298.     Pursuant to the BWC Directive, all supervisors are required to "ensure that any staff they encounter have their BWC powered on at all times and activated when interacting and/or escorting incarcerated individuals."[93]

299.     According to the BWC Directive, DOCCS has a "zero-tolerance policy for those staff who fail to abide by the policies and procedures. . . regarding the use of a BWC."[94]

300.     Pursuant to the BWC Directive, "on a weekly basis," Superintendents at facilities with a fully deployed or partially deployed BWC program, are required to "randomly review a total of 20 videos from different BWCs and tours."  The Superintendent will address any department policy violations, including making a referral to OSI and/or the Bureau of Labor Relations (BLR), if necessary."[95]

301.     Defendants Martuscello and Hilton took no steps to ensure that the On-Scene Defendants who were issued BWCs actually wore and activated them during every shift at Mid-State, as required.

302.     Defendants Martuscello and Hilton took no steps to ensure that the On-Scene Defendants received training on the wearing and operation of their body worn cameras, as required.

303.     Defendant Hilton did not conduct a weekly review of 20 videos from different BWCs, as required.

---

[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*

304.    Defendant Hilton did not address violations of this policy by Mid-State correction officers, including in connection with the use of force against Mr. Quiles as described in this Complaint, as required.

305.    Indeed, less than one month after the BWC Directive went into effect, the On-Scene Defendants purposefully turned their body cameras off or facing away so as not to capture Mr. Nantwi's fatal beating.

306.    Notwithstanding the murder of an incarcerated person directly across the street, Defendants Martuscello and Hilton took no action to secure additional supervision for incarcerated individuals at Mid-State, like Mr. Nantwi.

307.    Defendants Martuscello and Hilton took no meaningful action to prevent the On-Scene Defendants from beating Mr. Nantwi to death less than three months after Mr. Brooks was killed.

**D.    Defendants Martuscello and Hilton Were Aware of and Deliberately Indifferent to the Risk of Harm Posed by CERT Officers**

308.    At all times relevant to this Complaint, Defendants Martuscello and Hilton were personally aware of the serious risk of harm that Corrections Emergency Response Team units ("CERT Units") across DOCCS facilities, including at Mid-State, posed to incarcerated individuals like Mr. Nantwi.

309.    The violence and unchecked abuse by CERT officers across DOCCS facilities is well-known and thoroughly documented.

310.    In November 2022, CERT officers savagely beat at least 26 incarcerated individuals at Sing Sing Correctional Facility.[96]

---

[96] Benjamin Weiser, *At Sing Sing, Prisoners' Charges of Brutal Beatings Prompt U.S. Inquiry,* N.Y. TIMES (Feb. 23, 2023), https://www.nytimes.com/2023/02/23/nyregion/sing-sing-beatings-

311.    During this attack, CERT officers at Sing Sing ordered incarcerated individuals to strip to their boxer shorts, punched and kicked them, grabbed their genitals, slammed their heads against walls or floors, pepper sprayed their eyes and mouths, and burned them on nearby radiators.[97]

312.    Throughout the attack, the CERT officers declared "stop resisting" and "this is our house."[98]

313.    Travis Matthews, one of the incarcerated individuals at Sing Sing who was viciously beaten by CERT officers stated that, as they walked him down the gallery, "CERT officers took turns punching me in the face" and that he saw officers "do the same thing" to three other inmates.[99]

314.    In October 2023, CERT officers violently abused and tortured approximately 46 incarcerated individuals at Green Haven Correctional Facility, including beating them, slamming their heads against lockers, spraying them with OC spray, gouging their eyes, and kicking their genitals.[100]

315.    During this assault, Green Haven CERT officers marched through the prison chanting "Whose house? Our house."[101]

---

investigation.html?smid=nytcore-ios-share&referringSource=articleShare.
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Taylor v. State of New York*, Claim No. E23-5142 (N.Y. Ct. Cl., 2023); *see Wright v. State of New York,* Claim No. E23-5143 (N.Y. Ct. Cl., 2023); *see also* Blaise Gomez, *46 Green Haven Prisoners File Lawsuit Against NYS Alleging Abuse and Torture During Lockdown Searches*, NEWS12 LONG ISLAND, https://longisland.news12.com/46-green-haven-prisoners-file-lawsuits-against-nys-alleging-abuse-and-torture-during-lockdown-searches.
[101] *Id.*

316.    Several of the incarcerated individuals beaten by CERT officers at Green Haven were subsequently taken to Great Meadow Correctional Facility, where CERT officers proceeded to waterboard them.[102]

317.    Sean Chung, a former inmate at Marcy Correctional Facility experienced numerous beatings by CERT officers.

318.    Mr. Chung explained that "when CERT comes in, there's nothing you can do" and that "you're going to be hurt badly, and it's not a regular beating. It's not like you had a fistfight at the bar. This is a different kind of whooping."[103]

319.    Ronald Anderson, another former inmate at Marcy, echoed Mr. Chung's sentiments and said the CERT Unit at Marcy is known as the "demon squad" and has a reputation for abuse.  Mr. Anderson reported being beaten by CERT officers at Marcy, who punched him numerous times in his rib cage while he was handcuffed on his knees.[104]

320.    CERT officers have been involved in numerous incidents of abuse and violence against incarcerated individuals at Mid-State.

321.    As detailed in this Complaint, CERT officers at Mid-State violently beat Mr. Quiles on February 28, 2025, only *one day* before CERT officers beat Mr. Nantwi to death.

322.    Defendants Martuscello and Hilton were personally aware of and deliberately indifferent to the substantial risk of serious harm posed by CERT officers across DOCCS facilities, including at Mid-State.

---

[102] *Id.*
[103] Charles Lane, *NY Prison Emergency Teams Face Scrutiny After Fatal Beating. Inmates Call them the "Demon Squad"*, GOTHAMIST (Jan. 5, 2025) https://gothamist.com/news/ny-prison-emergency-teams-face-scrutiny-after-fatal-beating-inmates-call-them-the-demon-squad.
[104] *Id.*

323.    Defendants Martuscello and Hilton took no meaningful action to protect incarcerated individuals at Mid-State, including Mr. Nantwi, from this risk of harm posed by CERT officers.

**E.    Defendants Martuscello and Hilton Were Aware of and Deliberately Indifferent to the Heightened Risk of Harm to Incarcerated People Caused by the Wildcat Strikes**

324.    On February 17, 2025, correction officers at two DOCCS facilities abandoned their posts and began an illegal "wildcat" strike.

325.    Striking officers claimed to be protesting staffing shortages in DOCCS facilities, forced overtime, and dangerous working conditions.

326.    Striking officers also demanded the repeal of the Humane Alternatives to Long-Term (HALT) Solitary Confinement Act, which sought to cap periods of solitary confinement for incarcerated individuals and to prohibit it for certain populations.

327.    Within a few days, more than ten thousand correction officers in nearly every prison across New York State were participating in the unsanctioned strike.

328.    The strike violated state law as well as the officers' own collective bargaining agreement.

329.    The striking officers' disregard for state law, their own collective bargaining agreement, and the safety of incarcerated individuals reflects the longstanding pattern, practice, and custom across DOCCS facilities of allowing officers to disobey rules with impunity.

330.    On February 19, 2025, Governor Hochul issued an executive order declaring a state of emergency and deploying approximately 7,000 National Guard troops to staff DOCCS facilities.

331.    The strike persisted until March 10, 2025.

332.    At least 9 incarcerated individuals died during the illegal strike, including Mr. Nantwi, two men at Auburn Correctional Facility who did not receive needed medical treatment in time, and two men at Sing Sing Correctional Facility who died by suicide when no officers were present to intervene.

333.    Defendants Martuscello and Hilton were aware of the staffing shortages at Mid-State from February 17, 2025 to March 10, 2025, caused by the strike.

334.    Defendants Martuscello and Hilton were aware of the increased risk of violence by correction officers towards incarcerated individuals caused by the strike.

335.    Defendants Martuscello and Hilton took no meaningful action to protect incarcerated individuals at Mid-State, including Mr. Nantwi, from the increased risk of harm posed by the strike.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Eighth Amendment
### Excessive Force
### (Against All On-Scene Defendants)

336.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

337.    At all relevant times, the On-Scene Defendants acted under color of state law.

338.    As described more fully above, the On-Scene Defendants violated Mr. Nantwi's Eighth Amendment right to be free from excessive force through their use of excessive force and/or their failure to intervene to prevent their fellow On-Scene Defendants' use of excessive force against Mr. Nantwi.

339.    Information known to date demonstrates that the use of excessive force included, at minimum, punching, hitting, kicking, and otherwise striking various parts of Mr. Nantwi's body, including his body, head, and face, using their fists, batons, and boots.

340.    As described more fully above, the degree of force used against Mr. Nantwi was objectively unreasonable because Mr. Nantwi was unarmed and posed no security risk.

341.    The On-Scene Defendants' attack on Mr. Nantwi served no legitimate penological or government interest and was intended to injure him.

342.    The On-Scene Defendants each had a legal duty to intervene to prevent or halt their fellow On-Scene Defendants' use of excessive force against Mr. Nantwi.

343.    The On-Scene Defendants each had a realistic opportunity to intervene during Mr. Nantwi's fatal beating.

344.    The On-Scene Defendants were subjectively aware that Mr. Nantwi's constitutional rights were being violated during the fatal beating because they observed and heard Mr. Nantwi's assault as it was occurring in and around their presence.

345.    The On-Scene Defendants failed to intervene to prevent or halt their fellow On-Scene Defendants' use of excessive force against Mr. Nantwi.

346.    Following the attack, the On-Scene Defendants conspired to plant a weapon in Mr. Nantwi's cell and to submit false reports to their supervisors, demonstrating, among other things, their consciousness of guilt.

347.    In the manner described more fully above, the On-Scene Defendants acted willfully, wantonly, recklessly, maliciously, and with depraved and deliberate indifference to Mr. Nantwi's life.

348.    In brutally assaulting Mr. Nantwi and/or failing to intervene, the On-Scene Defendants inflicted a cruel and unusual punishment and used unlawfully excessive force against Mr. Nantwi in violation of his rights under the Eighth Amendment to the United States

Constitution, as applied to the State of New York under the Fourteenth Amendment to the United

States Constitution.

349.    The misconduct described in this Count directly and proximately caused Mr.

Nantwi to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his

death.

350.    The misconduct described in this Count directly and proximately caused Mr.

Nantwi to die, robbing him of future enjoyment of his life.

### SECOND CAUSE OF ACTION
#### 42 U.S.C. § 1983 – Eighth Amendment
#### Deliberate Indifference to Serious Medical Needs
#### (Against All On-Scene Defendants)

351.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

352.    At all relevant times, the On-Scene Defendants acted under color of state law.

353.    As described more fully above, the On-Scene Defendants violated Mr. Nantwi's

Eighth Amendment right to be free from cruel and unusual punishment by acting with deliberate

indifference to his obviously dire medical condition and serious need for medical treatment.

354.    As described more fully above, the On-Scene Defendants observed, heard, or

knew that Mr. Nantwi suffered significant injuries throughout his beating and that he required

immediate medical attention.

355.    The On-Scene Defendants were subjectively aware that failing to provide Mr.

Nantwi with immediate medical care put him at risk of suffering serious bodily harm or death.

356.    The On-Scene Defendants had a legal duty to act to ensure that Mr. Nantwi

received medical treatment for his critical medical condition.

357.    The On-Scene Defendants consciously disregarded the risk of serious bodily harm

or death by failing to take steps to provide Mr. Nantwi with medical treatment.

358.     The On-Scene Defendants took no steps to mitigate the risk that Mr. Nantwi would suffer serious bodily harm or death.

359.     The On-Scene Defendants' deliberate indifference to Mr. Nantwi's obvious need for medical treatment inflicted a cruel and unusual punishment against Mr. Nantwi in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

360.     The misconduct described in this Count directly and proximately caused Mr. Nantwi to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

361.     The misconduct described in this Count directly and proximately caused Mr. Nantwi's death, robbing him of future enjoyment of his life.

<div align="center">

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 – Eighth Amendment**
**Conspiracy to Violate Civil Rights**
**(Against All On-Scene Defendants)**

</div>

362.     Plaintiff repeats and realleges each allegation above as if fully set forth herein.

363.     At all relevant times, the On-Scene Defendants acted under color of state law.

364.     As described more fully above, the On-Scene Defendants conspired and acted in concert to violate Mr. Nantwi's Eighth Amendment rights to be free from excessive force.

365.     On or about March 1, 2025, the On-Scene Defendants entered into an explicit and/or tacit agreement, conspired, and acted in concert with each other to use excessive force against Mr. Nantwi, to plant a weapon in his cell and concoct a false narrative of Mr. Nantwi's injuries, and to cover up each other's misconduct.

366.     On or about March 1, 2025, the On-Scene Defendants used malicious and sadistic, gratuitous, excessive, brutal, objectively unreasonable, and unconscionable force on Mr.

Nantwi, and/or failed to prevent other officers from doing so despite having a realistic opportunity to intervene.

367.    In furtherance of the conspiracy to contribute to and cover up the acts of brutality against Mr. Nantwi, the On-Scene Defendants acted overtly to plant a weapon in Mr. Nantwi's cell, to concoct a false narrative that Mr. Nantwi was armed and that their use of force was justified, which they later told to investigators, and to cover up each other's misconduct by filing false reports and making false statements.

368.    The On-Scene Defendants' actions, committed in furtherance of their goal, inflicted a cruel and unusual punishment against Mr.  Nantwi in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

369.    In the manner described more fully above, each of the On-Scene Defendants acted knowingly, intentionally, willfully, wantonly, recklessly, maliciously, and with depraved and deliberate indifference to Mr. Nantwi's life.

370.    The misconduct described in this Count directly and proximately caused Mr. Nantwi to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

371.    The misconduct described in this Count directly and proximately caused Mr. Nantwi to die, robbing him of future enjoyment of his life.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Eighth Amendment
### Failure to Protect
### (Against Defendants Martuscello and Hilton)

372.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

373.    At all relevant times, the On-Scene Defendants acted under color of state law.

374.    As described more fully above, Defendants Martuscello and Hilton, and other as yet identified supervisory individuals, violated Mr. Nantwi's Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from a substantial risk of serious harm.

375.    As described more fully above, Defendants Martuscello and Hilton knew that DOCCS' culture of violence and cover ups posed a substantial risk of serious harm to incarcerated individuals like Mr. Nantwi.

376.    As described more fully above, Defendants Martuscello and Hilton knew that the members of DOCCS' CERT Units, including the Mid-State CERT Unit, posed a substantial risk of serious harm to incarcerated individuals like Mr. Nantwi.

377.    Defendants Martuscello and Hilton possessed this knowledge not only from their own years of experience working in supervisory roles within DOCCS, but also through independent reports, investigative reporting, jury verdicts, and criminal prosecutions concerning DOCCS correction staff, including those at Mid-State, as described above.

378.    Defendants Martuscello and Hilton acted with deliberate indifference to this risk of harm by failing to take reasonable steps to mitigate the risk of harm to incarcerated individuals like Mr. Nantwi.

379.    Defendants Martuscello and Hilton acted with deliberate indifference to the risk of harm posed by members of the CERT Units by failing to take reasonable steps to mitigate the risk of harm to incarcerated individuals like Mr. Nantwi.

380.    Defendants Martuscello and Hilton were personally responsible for ensuring the safety of incarcerated individuals under their care and custody, including Mr. Nantwi.

381.    Defendants Martuscello and Hilton had the power and responsibility to implement and enforce policies and practices to protect incarcerated people at Mid-State from the use of excessive force by staff, including the force used against Mr. Nantwi.

382.    Defendants Martuscello and Hilton were personally involved in the attack of Mr. Nantwi because, as a direct and proximate cause of the deliberate indifference described in this Count, the On-Scene Defendants were emboldened to savagely beat Mr. Nantwi, confident that their misconduct would never be subject to any meaningful scrutiny or discipline.

383.    The misconduct described in this Count directly and proximately caused Mr. Nantwi to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

384.    The misconduct described in this Count directly and proximately caused Mr. Nantwi to die, robbing him of future enjoyment of his life.

## DAMAGES

385.    Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Messiah Nantwi, is entitled to an award of compensatory damages for Mr. Nantwi's severe physical and emotional pain and suffering.

386.    Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Messiah Nantwi and its distributees, is entitled to an award against all Defendants for loss-of-life or hedonic damages for the death of Mr. Nantwi caused by the deprivation of his civil rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

387.    Based upon the facts and legal claims set forth above, and specifically the intentional, reckless, and grossly negligent conduct of the individual Defendants, Plaintiff, on

behalf of the Estate of Messiah Nantwi and its distributees, is entitled to an award of punitive damages against Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against all Defendants for compensatory damages, punitive damages, and attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 17, 2025

<div style="margin-left: 50%;">

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____

Earl S. Ward
Katherine Rosenfeld
Hannah Brudney
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000


OWEN LAMB, ESQ.
Owen Lamb
356 W 58th St
The Hudson - #1916
New York, NY 10019
(212) 333-4444
*Attorneys for Plaintiff*

</div>