**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

DAHLIA DAMAS, New York County Public
Administrator, in her capacity as Administrator of the
ESTATE OF MESSIAH NANTWI,                                    9:25-cv-00775 (BKS/ML)

                              Plaintiff,

v.

CORRECTION OFFICER JOSHUA BARTLETT;
CORRECTION OFFICER CALEB BLAIR;
CORRECTION OFFICER DANIEL BURGER;
SERGEANT FRANCIS CHANDLER; CORRECTION
OFFICER DEAN CROSS; CORRECTION OFFICER
THOMAS ECK; SERGEANT DAVID FERRONE;
SUPERINTENDENT OF MID-STATE CORRECTIONAL
FACILITY BRYAN HILTON; SERGEANT MICHAEL
IFFERT; CORRECTION OFFICER FRANK JACOBS;
CORRECTION OFFICER ADAM JOSEPH;
CORRECTION OFFICER CRAIG KLEMICK;
CORRECTION OFFICER ZACHARY LALLIER;
CORRECTION OFFICER JONAH LEVI;
COMMISSIONER OF THE NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION DANIEL F.
MARTUSCELLO III; CORRECTION OFFICER
NATHAN PALMER; CORRECTION OFFICER RYAN
RUSSELL; CORRECTION OFFICER TRISTAN
SHEPPARD; SERGEANT DONALD SLAWSON;
CORRECTION OFFICER NICHOLAS VITALE; and
JOHN AND JANE DOES 1-20, as yet identified
individuals,

                              Defendants.

---

**Appearances:**

*For Plaintiff:*
Earl S. Ward
Katherine Rosenfeld
Hannah Brudney
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020

*For Defendant Martuscello:*
Letitia James
Attorney General of the State of New York
Aimee Cowan
Assistant Attorney General
300 South State Street, Suite 300
Syracuse, New York 13202

*For Defendant Jonah Levi:*
Lewis G. Spicer
Spicer Law Office
121 East Water Street, Suite 100
Syracuse, New York 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Dahlia Damas, administrator of the estate of Messiah Nantwi, brings this 42

U.S.C. § 1983 action against numerous New York State Department of Corrections and

Community Supervision ("DOCCS") officials, asserting claims arising out of the beating of

Nantwi in DOCCS custody which resulted in his death. (Dkt. No. 1). Presently before the Court

is Defendant DOCCS Commissioner Daniel F. Martuscello III's motion to dismiss Plaintiff's

failure-to-protect claim against him.[1] (Dkt. No. 81). The motion is fully briefed. (Dkt. Nos. 81-1,

123, 124). For the reasons that follow, the motion is denied.

---

[1] Martuscello also moves to dismiss Defendant Jonah Levi's crossclaim against him. (Dkt. No. 148; *see also* Dkt. No. 131, ¶¶ 51–52). Levi has failed to respond to the motion. To the extent Levi asserts "common-law contribution and indemnification claims," "there is no federal right to indemnification or contribution under § 1983." *See Steele-*

2

## II.    FACTS[2]

Nantwi resided at Mid-State Correctional Facility in March 2025. (*See* Dkt. No. 1, ¶¶ 20, 39). Martuscello was DOCCS Commissioner at that time, having served in that role since May 2024. (*Id.* ¶¶ 33–34). As Commissioner, he possessed the "responsibility and authority to set policies, make rules, communicate expectations, issue disciplinary actions," and "ensur[e] the safety of individuals in DOCCS custody." (*Id.* ¶¶ 35–36, 112). Previously, Martuscello served as Acting Commissioner and had "nearly three decades of experience working for DOCCS." (*Id.* ¶¶ 34, 37). He had most recently served six years "as second-in-command to [former] Commissioner Anothony Annucci"—so upon his appointment, Martuscello "was widely recognized for his vast institutional knowledge of DOCCS." (*See id.* ¶ 37).

### A.    Nantwi's Beating and Death

On March 1, 2025, "at least eighteen correction officers and sergeants" at Mid-State "viciously" beat an unarmed, handcuffed Nantwi, "and/or stood by and watched" the beating. (*Id.* ¶¶ 1–3 (emphasis omitted)). Nantwi "was eventually taken" to a hospital "where he was pronounced dead, due to massive head trauma and numerous blows to the body." (*Id.* ¶ 4).

That morning, two national guardsmen—who had been assigned to Mid-State following a correction officer strike—directed Nantwi to return to his cell from the shower area. (*Id.* ¶¶ 39–40, 327, 330). Although at first Nantwi objected, his "cellmate persuaded [him] to" follow this

---

*Warrick v. Microgenics Corp.*, 738 F. Supp. 3d 222, 225 n.2 (E.D.N.Y. 2024); *Castro v. Cnty. of Nassau*, 739 F. Supp. 2d 153, 184 (E.D.N.Y. 2010) (Bianco, J.). And although "[c]ontractual indemnification is available for [§] 1983 claims," *Pub. Adm'r of Cnty. of Nassau v. Cnty. of Nassau*, No. 2:17-CV-5623, 2024 WL 3816866, at *3, 2024 U.S. Dist. LEXIS 147804, at *6 (E.D.N.Y. Aug. 14, 2024), Levi fails to allege the existence of any contractual "relationship whereby [Martuscello was personally] liable for [Levi's] torts," *see Castro*, 739 F. Supp. 2d at 184–85 (citation modified). Accordingly, the Court grants Martuscello's motion to dismiss Levi's crossclaim. It will, however, afford Levi an opportunity to file an amended answer in the event he can add allegations curing the above-identified deficiency as to contractual indemnification.

[2] The facts are drawn from the complaint. (Dkt. No. 1). The Court assumes the truth of, and draws all reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

direction, and Nantwi "did without any issue or further incident." (*Id.* ¶¶ 41, 43). Nantwi "was unarmed and made no physical advances towards" the guardsmen. (*Id.* ¶ 42). Nevertheless, they broadcast a request for assistance, to which a Mid-State Corrections Emergency Response Team ("CERT") responded. (*Id.* ¶¶ 44–45). The CERT was comprised of eighteen named Defendants in this action. (*Id.* ¶ 45).

Upon the CERT's arrival to his room, Nantwi "held his arms up in a gesture of compliance and displayed no weapon." (*Id.* ¶ 46). But after the guardsmen pointed Nantwi out, CERT members "immediately grabbed [him], handcuffed him, and began to beat him, and/or failed to intervene" to stop their colleagues. (*Id.* ¶ 47). The beating continued for roughly five minutes. (*Id.* ¶ 49). CERT members "kicked, punched, and struck . . . Nantwi's body, face, and head repeatedly with their fists, batons, and boots"; Nantwi twice lost consciousness. (*Id.* ¶¶ 49–50, 56). The officers also picked up Nantwi "and slammed his body . . . on the ground." (*Id.* ¶ 51). Nantwi made some efforts to defend himself—which "only intensified the beating"—and "pleaded with officers to stop, including saying repeatedly 'I didn't do nothing,' and '[s]top, you're really hurting me!'" (*Id.* ¶¶ 52–54). The CERT members ignored these pleas, "yell[ing] at him to 'stop resisting,'" even though he could not resist given the handcuffs and number of officers. (*Id.* ¶ 55). During all this, the CERT members "were either not wearing their mandated body cameras or had turned them off or away . . . to ensure they would not capture" video of the beating. (*Id.* ¶ 57). None intervened to help Nantwi. (*See id.* ¶¶ 49–51, 56, 58, 60).

Eventually, the CERT members "dragged" Nantwi out of his room and down a set of stairs, unconscious, covered in blood, and apparently unable to breathe. (*See id.* ¶¶ 61–64). They continued beating him in the stairwell, before placing him in an infirmary holding cell. (*Id.* ¶¶ 65–66). There still, one CERT member continued to beat Nantwi while the others did nothing.

(*Id.* ¶¶ 67–68). All then left Nantwi unattended in the cell, "despite his clear need for urgent medical treatment." (*Id.* ¶ 70). Nantwi died later that day in an outside hospital, succumbing to "massive head trauma, accompanied by numerous blows to the body." (*Id.* ¶¶ 71–73). The involved CERT members later conspired to cover up their conduct—falsely claiming they discovered a weapon in Nantwi's cell, filing false reports, and cleaning up Nantwi's blood from the infirmary holding cell, which "prevented law enforcement from conducting any analysis of blood or blood spatter evidence." (*See id.* ¶¶ 74–96). They later faced state criminal charges. (*Id.* ¶¶ 98–100).

### B.    Martuscello's Response and the Alleged Pattern, Practice, and Custom of Excessive Force

Following Nantwi's death, "Martuscello admitted that DOCCS must 'do better to change our culture' and [stated] that he was 'committed to impactful change to end the violence within the system.'" (*Id.* ¶ 110). The complaint alleges that Nantwi's murder and the subsequent cover up comprised the latest chapter in "a longstanding pattern, practice, and custom of excessive, and sometimes fatal, force by correction[] officers against incarcerated people," accompanied by a "strict code of silence." (*See id.* ¶¶ 104–06). That code led correction officers to "ignore or affirmatively cover up other officers' misconduct and abuse." (*See id.* ¶ 106).

According to the complaint, "[i]ncidents of physical violence and abuse at DOCCS facilities followed by attempted cover-ups of such violence, including at Mid-State, have been thoroughly documented, publicized, and confirmed by" numerous sources. (*Id.* ¶ 108). And various "tools available to" Martuscello would have "reduce[d] the risk of harm" officers posed to incarcerated individuals, Plaintiff says—including, among other things, "counseling, monitoring, temporary reassignment, additional training, pursuing discipline, and meeting with the individual officer and/or their supervisor to discuss the use of force." (*See id.* ¶¶ 180, 229–30,

5

271–72). Nevertheless, Martuscello "took no meaningful action to mitigate the risk of serious harm posed by the pattern, practice, and custom of excessive force." (*Id.* ¶ 114).

### C.       Martuscello's Knowledge of the Culture of Physical Abuse and Cover Ups

Martuscello, Plaintiff alleges, knew of the dangerous pattern, practice, and custom of excessive force by corrections officers, presenting a serious risk of harm to those incarcerated at Mid-State, but failed to act. (*See id.* ¶¶ 108–14, 116, 125, 140–41, 180–81, 195, 215, 228–31, 240, 242–45, 258, 270–73, 301–02, 306–07, 323, 335). The complaint recounts in detail specific sources of information that made Martuscello aware of this culture and the risk of harm posed to incarcerated people.

### 1.       Briefing Regarding Excessive Force Incidents

Given his leadership roles within DOCCS, the complaint says, Martuscello has "been personally informed, briefed on, and updated about significant use of force incidents throughout DOCCS." (*Id.* ¶ 117). Specifically, "[f]rom 2012 to 2023, [he] was responsible for reviewing all Office of Special Investigation ('OSI') reports and deciding whether to issue Notices of Discipline for correctional staff who physically abused incarcerated individuals." (*Id.* ¶ 118). And from 2012 to the present, he "has been personally informed of significant OSI investigations involving staff abuse and lawsuits involving abuse by correction officers." (*Id.* ¶ 119).

### 2.       The 2015–2016 New York Times-Marshall Project Investigation

"From 2015 to 2016, the Marshall Project and the New York Times conducted an extensive investigation of DOCCS facilities to examine the use of force by corrections officers at" New York prisons. (*Id.* ¶ 126). That investigation "concluded that a 'culture of brutality ha[d] been allowed to thrive in the prisons, where a few rogue guards, often known . . . as beat-up squads, administer[ed] vigilante justice, while fellow officers look[ed] the other way.'" (*Id.*

6

¶ 127). It "also noted that 'perhaps the biggest challenge for investigators [was] the culture of silence among guards.'" (*Id.* ¶ 128 (alteration adopted)).

The New York Times published the investigation's findings in a series of articles starting in February 2015, which "documented numerous horrific instances of violence against incarcerated individuals across DOCCS facilities." (*Id.* ¶¶ 129–30). One article characterized Leonard Strickland's 2010 killing at Clinton Correctional Facility—"by a group of correction officers who viciously beat him and pushed him down a flight of stairs"—as "consistent with 'a troubling pattern of savage beatings by corrections officers at prisons across New York State and a department that rarely holds anyone accountable.'" (*Id.* ¶ 131). Another article chronicled Fishkill Correctional Facility's "'Beat Up Squad,' a group of officers notorious for committing gruesome and unjustified assaults on incarcerated people." (*Id.* ¶ 132). During 2015, that group killed Samuel Harrell "in a building at Fishkill that had been flagged to DOCCS officials as a 'violent place,' due to the unjustified abuse that routinely took place there." (*Id.*). The officers later "falsely claimed" that Harrell had assaulted them and overdosed, even though his autopsy revealed no evidence of "illegal drugs." (*Id.*). A third article recounted the near-fatal beating of George Williams at Attica Correctional Facility in 2011. (*Id.* ¶ 133). After that attack, too, "officers engaged in an elaborate cover up, falsifying official reports and destroying evidence." (*Id.*). Yet another article described the "brutal[]" assault a correction officer—who later denied involvement and "lied to investigators"—inflicted on Ramon Fabian in 2014 at Ulster Correctional Facility. (*Id.* ¶ 134). Overall, the investigation "noted a troubling pattern of officer" assaults and "coverups." (*See id.* ¶¶ 135–37).

Martuscello—then serving as a DOCCS Deputy Commissioner—was interviewed and photographed in connection with this investigation. (*Id.* ¶¶ 138–39). He "was personally aware

7

of the contents of the [investigation], including the numerous instances of physical abuse documented therein," and "told reporters that he was ready to 'do anything necessary' to fight the correction officers' union." (*Id.* ¶¶ 139–40).

### 3. Civil and Criminal Litigation Involving DOCCS

"Since approximately 2017," Martuscello "was made personally aware of significant legal cases . . . , including settlements and jury verdicts involving allegations of excessive force by DOCCS staff as well as criminal charges brought against correction officers involving excessive force and cover ups." (*Id.* ¶ 151). Plaintiff cites to a series of jury verdicts, settlements, and criminal pleas evidencing persistent physical violence and abuse across DOCCS facilities, including the following. (*See id.* ¶¶ 142–51).

In March 2025, a lieutenant at Auburn Correctional Facility—who had "waterboarded and violently assaulted" a "shackled and defenseless" Matthew Raymond while correction officers stood by—settled a subsequent civil rights lawsuit for $1.2 million. (*See id.* ¶ 143 & n.20). In November 2023, Terry Cooper's family received a $9.25 million verdict in connection with Cooper's "fatal beating by Clinton correction officers, who beat Cooper so severely that it caused a fatal asthma attack, deprived him of his asthma pump, and then covered up the attack and denied the use of force." (*Id.* ¶ 144).

In 2021 and 2022, DOCCS settled three lawsuits "in connection with assaults of incarcerated individuals by correction officers at Green Haven Correctional Facility." (*Id.* ¶ 145). Later, in July 2022, a correction officer at the same facility pled guilty to a violation of 18 U.S.C. § 242 after he handcuffed Melvin Virgil "and repeatedly smashed his head into a wall and steel bars as other officers silently watched"; other officers later fabricated reports of misconduct

against Virgil.[3] (*Id.* ¶ 146). Another jury in February 2020 "awarded Jerome Anderson $650,000 after finding a sergeant and three officers at Green Haven liable for excessive force"—they had "coordinated an attack on . . . Anderson by taking him to an area lacking surveillance where they punched, stomped, and kicked him for several minutes." (*Id.* ¶ 149).

A jury awarded Nicholas Magalios a $1 million verdict after three Fishkill Correctional Facility officers held him down—"brutally kicking and punching him while other officers looked on and did nothing to intervene"—and then created false reports and gave false testimony. (*Id.* ¶ 147). The court in that case "stated that the officers' 'conduct seem[ed] to be all too acceptable among certain employees of New York's prison system' and that 'similar acts often go undetected in correctional facilities.'" (*Id.*). Sullivan Correctional Facility officers settled excessive force claims for $5 million in May 2020 stemming from the fatal assault of Karl Taylor. (*Id.* ¶ 148). And in 2016, five officers from Downstate Correctional Facility were charged—and later convicted—with federal criminal offenses stemming from their "brutal[]" beating of Kevin Moore in which they broke his ribs and facial bones and ripped "one of his dreadlocks out of his head," hospitalizing him for 17 days. (*Id.* ¶ 150). The U.S. Attorney "noted that 'excessive use of force in prisons ha[d] reached crisis proportions in New York State.'" (*Id.* (alteration adopted)).

### 4.    The 2023 New York Times-Marshall Project Investigation

A second New York Times and Marshall Project investigation, Plaintiff says, revealed a pervasive pattern of coverups across DOCCS. (*See id.* ¶¶ 153–63). This 2023 investigation "focused on an analysis of 5,600 DOCCS disciplinary records dating back to 2010." (*Id.* ¶ 153).

---

[3] Section 242 "makes it unlawful for anyone under color of any law to willfully subject any person to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." *United States v. Martinez*, 110 F.4th 160, 172 (2d Cir. 2024) (citation modified).

It "concluded that staff cover ups of excessive force incidents [were] commonplace across DOCCS facilities." (*Id.* ¶ 154). "[R]ecords revealed that correction officers typically 'work[ed] in groups to conceal violent assaults by lying to investigators and on official reports,'" before filing "charges against their victims and hav[ing] them sent to solitary." (*Id.* ¶ 155).

Martuscello was interviewed in connection with this investigation, too, and "stated that he was not surprised that false reports often accompany instances of excessive force, noting that 'there ha[d] to [have been] some manipulation of facts.'" (*Id.* ¶¶ 156–57 (alteration adopted)). As part of its "general practice," the Marshall Project sent DOCCS a letter "outlining the findings of its investigation" before publication. (*Id.* ¶ 158). Accordingly, Plaintiff alleges, "Martuscello was personally aware of the contents of [this investigation], including the numerous instances of staff cover ups" it documented. (*Id.* ¶ 159). Martuscello, "[a]s a member of the DOCCS Executive Team," was also "provided with news clips containing information about DOCCS," like those stemming from this investigation. (*See id.* ¶¶ 161–62).

### 5. Warnings from Outside Advocates

Advocates also warned Martuscello regarding the pervasive culture of excessive force. One outside organization, the Correctional Association of New York ("CANY"), "[s]everal times per week . . . directly notifie[d] DOCCS and other state agencies about allegations of abuse, maltreatment, neglect, or violations carried out by staff in New York's prisons." (*Id.* ¶ 152). "Since at least 2022, New York state prisoners' rights advocates have held quarterly conference calls with . . . Martuscello to discuss issues pertaining to DOCCS"—and in each one, advocates "voiced their concerns about the continual assaults and beatings of incarcerated individuals in DOCCS facilities." (*Id.* ¶¶ 164–65). In one early 2024 call, an advocate "explicitly warned" Martuscello that this "spiraling violence by correction officers was a 'ticking time-

bomb' and would soon result in an incarcerated individual's death." (*Id.* ¶ 166). "Martuscello dismissed these concerns." (*Id.* ¶ 167).

In August 2024, prisoners' rights advocates met Martuscello in person to further "discuss the rampant abuse of incarcerated individuals." (*Id.* ¶ 168). Again, he dismissed these "warnings and pleas to address the culture of abuse and downplayed the violence by staff," remarking "that there were 'too many cameras inside the prisons' for staff abuse to occur." (*Id.* ¶¶ 169–70).

### 6.    The Fatal Beating of Robert Brooks

In December 2024—three months before Nantwi's fatal beating—"fourteen correction officers at Marcy Correctional Facility sadistically beat Robert Brooks to death."[4] (*See id.* ¶¶ 171–72, 274–83). The "savage beating was recorded on several of the correction officers' body cameras, without their knowledge." (*Id.* ¶ 276). In the recording, "[o]ver the course of ten minutes, at least six correction officers can be seen repeatedly punching, kicking and attacking" Brooks while he was handcuffed. (*Id.* ¶ 277). "At least nine other officers can be seen standing by, watching . . . Brooks get beaten to death." (*Id.* ¶ 280). The officers standing by "appear to be completely unfazed by the horror"; some "even appear to be amused, visibly smiling, or laughing." (*See id.* ¶¶ 281–82). This recording "confirm[ed] the pattern and practice of rampant abuse within DOCCS facilities that incarcerated individuals have reported and that CANY ha[d] documented and warned about for years." (*Id.* ¶ 284).

In response, "Martuscello issued a public statement that watching the video of [the] killing made him feel 'deeply repulsed and nauseated'"; he "acknowledged that there was 'no excuse' for the officers' actions and recognized the need for 'institutional change' to prevent similar incidents in the future." (*Id.* ¶¶ 285–87). Martuscello "pledged to prevent 'this type of

---

[4] Marcy is across the street from Mid-State. (Dkt. No. 1, ¶ 275).

behavior' from recurring within DOCCS facilities and to investigate the entire department 'to identify places where [it could] improve and make changes.'" (*Id.* ¶ 292).

Following Brooks's death, DOCCS instituted updated policies requiring correction officers "to wear and activate" body cameras for "the duration of their shift." (*Id.* ¶¶ 294–300). But Martuscello took no steps to ensure that the CERT Defendants "who were issued [cameras] actually wore and activated them during every shift at Mid-State, as required." (*Id.* ¶ 301). Less than one month after the policy's effective date, the CERT Defendants "purposefully turned their body cameras off or fac[ed] away so as not to capture . . . Nantwi's fatal beating." (*Id.* ¶ 305).

### 7.    Specific Incidents at Mid-State

Martuscello also knew that this pervasive culture of excessive force plagued Mid-State. "For decades," Plaintiff says, "the rampant and unchecked abuse of incarcerated individuals at Mid-State [was] thoroughly documented and publicized through the news media, independent research organizations, internal complaints by Mid-State incarcerated individuals, and numerous civil rights lawsuits." (*Id.* ¶ 176). And four of the CERT Defendants involved in Nantwi's fatal beating had previously used or been involved in the use of excessive force against incarcerated individuals at Mid-State. (*Id.* ¶¶ 186, 233–35, 260).

"In July 2016, approximately thirty correction officers conducted an extensive and violent raid of the 4H Housing Unit at Mid-State." (*Id.* ¶ 182). The raid—"condoned and overs[een]" by senior facility-level staff—aimed to locate a weapon "and to send a message to the incarcerated individuals that further assaults would not be tolerated." (*See id.* ¶¶ 183–85, 188, 192). "Officers and supervisors . . . savagely assaulted twenty-eight incarcerated individuals at Mid-State, 'indiscriminately kicking, punching, stomping, or slamming them'"; they also sexually assaulted three incarcerated individuals. (*Id.* ¶¶ 186–87). Defendant Donald Slawson took part in that raid and was a member of the CERT that attacked Nantwi. (*Id.* ¶¶ 22, 45, 186).

12

In December 2024, the New York State Court of Claims concluded that there was "no justification for the excessive and unreasonable use of force," which had been "condoned by the highest levels of prison administration." (*See id.* ¶¶ 189–90).

Martuscello knew of this Court of Claims finding. (*Id.* ¶ 194). And OSI—whose reports Martuscello was tasked with reviewing between 2012 and 2023—also "conducted an investigation, resulting in disciplinary actions against several officers and supervisors." (*Id.* ¶¶ 118, 191).

Separately, CANY issued a 2023 report detailing widespread physical abuse by staff at Mid-State. (*Id.* ¶¶ 196–208). The report stemmed from an October 2022 "comprehensive monitoring visit [that] included meetings with prison staff and 122 interviews with incarcerated individuals." (*Id.* ¶ 196). It "recorded incidents of 'routine—and sometimes racialized—abuse by staff, including physical assaults, and observations of a retaliatory environment.'" (*Id.* ¶ 198). The report further "noted that the 'most prominent open-ended finding for people in the general population at Mid-State was that of violence and abuse by security staff' and that 'physical abuse was regular and expected'" there. (*Id.* ¶ 199 (alteration adopted); *see also id.* ¶¶ 200–01). This was no "anomaly for DOCCS facilities." (*Id.* ¶¶ 202–03). The report further "highlighted Mid-State's failure to require its correction officers to wear body cameras," (*id.* ¶ 204–05), as well as that—although scheduled to have "between 1,500 to 1,700 stationary cameras" installed—those cameras' "date of installation was unknown," (*id.* ¶ 206). "In July 2023, pursuant to [its] standard practice, CANY provided the final published report to [Martuscello], who was tasked with "review[ing]" that report and "tak[ing] appropriate steps to protect the safety of incarcerated individuals at Mid-State." (*Id.* ¶¶ 212–13).

13

An April 2023 "unprovoked and wholly unjustified" assault of Mid-State incarcerated individual James Barton "corroborated CANY's findings about Mid-State and reflect[ed] the longstanding pattern, practice, and custom of excessive force by correction officers against incarcerated individuals at" the facility. (*Id.* ¶¶ 216–18). In that instance, "officers woke . . . Barton up shortly after midnight, took him to a hallway outside his unit, and ordered him to hold his identification card against the wall." (*Id.* ¶ 219). They "proceeded to punch and kick . . . Barton in his head, face, eyes, chest, back, stomach, legs, buttocks, and groin for approximately ten minutes until he fell to the floor"—yelling that they would "give him the George Floyd challenge," before putting him "in a chokehold while other officers beat him and kicked him." (*Id.* ¶¶ 220–21). After this, the officers "agreed to lie about their use of force and to deny involvement or knowledge of the incident to investigators." (*Id.* ¶ 222).

Two of these officers later pled guilty to § 242 violations in October 2024. (*Id.* ¶ 223). DOCCS officials "stated that [DOCCS had] helped federal prosecutors build their case" and "made a statement via email, indicating that 'discipline ha[d] been initiated with some staff terminated already and two people . . . convicted of federal crimes so far.'" (*Id.* ¶¶ 224–25 (alteration adopted)). So, Plaintiff says, Martuscello as DOCCS Commissioner "was personally aware of [this] beating by Mid-State correction officers." (*See id.* ¶ 226).

Another CERT Defendant in this action, Jonah Levi, attacked Mid-State incarcerated individual Shayzon Taylor in September 2023—just five months after Barton's beating—again "corroborat[ing] CANY's findings about Mid-State and reflect[ing] the longstanding pattern, practice, and custom of excessive force by correction[] officers against incarcerated people" there. (*Id.* ¶¶ 232–33). An outside hospital treated Taylor "for severe injuries," and in May 2024, DOCCS placed Levi "on a 12-month disciplinary evaluation, lasting through May 2025, for the

14

use of excessive physical force." (*Id.* ¶¶ 234–35). Martuscello had been "involved in the decision to place Defendant Levi on [this] disciplinary period." (*Id.* ¶ 237–38). So he was "aware of the specific risk of serious harm" Levi posed. (*Id.* ¶ 239). Nevertheless, Levi was a member of the CERT that attacked Nantwi in March 2025, "still in his disciplinary period stemming from" the Taylor beating. (*Id.* ¶ 236).

Another 2025 CANY report detailed continued physical abuse by Mid-State staff. (*Id.* ¶¶ 246–52). CANY conducted a second monitoring visit just 33 days before Nantwi's March 1, 2025 murder—a month after correction officers had murdered Brooks at nearby Marcy. (*Id.* ¶ 246). CANY "reiterated" to DOCCS officials "serious concerns about operational failures at Mid-State," reporting "that conditions [there] had deteriorated considerably since its monitoring visit in October 2022." (*Id.* ¶¶ 247–48; *see also id.* ¶¶ 251–52). The project to install the fixed surveillance cameras made no progress in the more than two years since the prior visit; and incarcerated individuals "continued to recount 'specific incidents of violence and abuse by correctional officers.'" (*Id.* ¶¶ 249–50).

As with the prior report, and "[c]onsistent with [its] standard practice, on January 27, 2025, CANY reported its findings and concerns about Mid-State directly to . . . Martuscello via email." (*Id.* ¶ 254). And again, given his role, "Martuscello was expected to read CANY's email detailing its concerns about Mid-State and take appropriate steps to protect the safety of incarcerated individuals at Mid-State." (*Id.* ¶¶ 255–56).

Finally, just a day before Nantwi's killing, two of the other CERT Defendants—Joshua Bartlett and Francis Chandler—along with other officers "brutally attacked" another Mid-State incarcerated individual, Christopher Quiles. (*See id.* ¶¶ 259–64). As part of this attack, the officers "beat . . . Quiles'[s] body, face, and head with their fists and batons"; pepper sprayed

15

him; and "used a hot pipe" to burn his skin, causing third-degree burns. (*Id.* ¶¶ 261–63). None wore their required body cameras. (*Id.* ¶ 264). Martuscello, Plaintiff alleges, knew of this incident on the day it happened because Quiles's aunt "wrote directly" to Martuscello that day "to report the incident and demand that corrective action be taken." (*Id.* ¶ 265–66).

### 8.    Additional Risk Factors

According to Plaintiff, Martuscello failed to address two additional conditions at Mid-State posing a risk to Nantwi's safety, of which he was aware. First was the specific risk posed by CERT officers. (*Id.* ¶¶ 308–23). "CERT officers across DOCCS facilities," Plaintiff alleges, perpetrated "well-known and thoroughly documented" "violence and unchecked abuse." (*Id.* ¶ 308–09). For example, "[i]n November 2022, CERT officers savagely beat at least 26 incarcerated individuals at Sing Sing Correctional Facility." (*Id.* ¶¶ 310–13). And "[i]n October 2023, CERT officers violently abused and tortured approximately 46 incarcerated individuals at Green Haven," "beating them, slamming their heads against lockers, spraying them with [pepper] spray, gouging their eyes, and kicking their genitals." (*Id.* ¶¶ 314–15). Certain of those incarcerated individuals "were subsequently taken to Great Meadow Correctional Facility, where CERT officers proceeded to waterboard them." (*Id.* ¶ 316). Similar occurrences took place at Marcy and Mid-State. (*See id.* ¶¶ 317–21).

Second, Martuscello also knew of the heightened risk to incarcerated individuals caused by illegal correction officer strikes. (*Id.* ¶¶ 324–35). In February 2025, correction officers in DOCCS facilities "abandoned their posts and began an illegal 'wildcat' strike"—protesting "staffing shortages in DOCCS facilities, forced overtime, and dangerous working conditions," as well as a recently-passed state law limiting solitary confinement. (*Id.* ¶¶ 324–28). The Governor deployed national guard troops to staff DOCCS facilities during the strike, which lasted until March 10, 2025. (*Id.* ¶¶ 330–31). At least nine incarcerated individuals died during the strikes,

16

including Nantwi. (*Id.* ¶ 332). Martuscello was aware of, but failed to address, the staffing

shortages the strike caused, as well as "the increased risk of violence by correction officers

toward incarcerated individuals." (*Id.* ¶¶ 333–35).

### III.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, the "complaint must provide 'enough facts to state a

claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*,

709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual

allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at

555. The court must "accept all factual allegations in the complaint as true and draw all

reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d

247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d

Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).

### IV.    DISCUSSION

#### A.    Eighth Amendment and Personal Involvement Principles

The Eighth Amendment proscribes cruel and unusual punishment, including punishments

that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153,

173 (1976). It requires that prison officials "take reasonable measures to guarantee the safety of"

incarcerated individuals. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation modified).

Eighth Amendment claims encompass "both objective and subjective components." *See Walker*

*v. Schult*, 45 F.4th 598, 610 (2d Cir. 2022); *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020).

Specifically, "to establish an Eighth Amendment violation for failure to protect or deliberate

17

indifference to safety," a plaintiff must plead and later "prove (1) 'that [he] is incarcerated under conditions posing a substantial risk of serious harm,' and (2) that the prison official had a 'sufficiently culpable state of mind,' which in 'prison-conditions cases' is 'one of deliberate indifference to [prisoner] health or safety.'" *Morgan*, 956 F.3d at 89 (quoting *Farmer*, 511 U.S. at 834). To be deliberately indifferent, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. An official's conduct may constitute deliberate indifference when he "knew of the [relevant] dangers and yet refused to remedy the situation." *See LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). The official must also have "had some ability to mitigate the serious risk to a plaintiff's health or safety." *See Suarez v. Morton*, 170 F.4th 33, 61 (2d Cir. 2026).

Additionally, in any § 1983 action, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). "[T]here is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

B.     **The Complaint Plausibly Alleges Martuscello's Deliberate Indifference**

Martuscello argues that the complaint fails to plausibly allege the subjective component, as well as his personal involvement.[5] (Dkt. No. 81-1, at 14–24; Dkt. No. 124, at 6–11). Plaintiff disagrees. (Dkt. No. 123, at 12–26).

---

[5] For the first time in his reply, Martuscello contests the objective component, arguing that the complaint fails to plausibly allege the existence of a "substantial risk of harm *as to*" *Nantwi*. (*See* Dkt. No. 124, at 10–11). Plaintiff has

18

Under *Tangreti*, Martuscello's personal involvement and subjective component arguments essentially present a single inquiry: whether the complaint plausibly alleges that Martuscello himself "acted with deliberate indifference—meaning that [Martuscello] personally knew of and disregarded an excessive risk to [Nantwi's] safety" stemming from the above-described pattern, practice, and custom of excessive force and other conditions at Mid-State. *See Tangreti*, 983 F.3d at 619 (citation modified). Accepting the complaint's allegations as true, and drawing reasonable inferences in Plaintiff's favor, *see Faber*, 648 F.3d at 104, the Court concludes that the complaint does.

The complaint provides ample allegations to plausibly infer that Martuscello was personally "aware of facts from which [he could draw] the inference . . . that a substantial risk of serious harm exist[ed]." *Farmer*, 511 U.S. at 837; *Tangreti*, 983 F.3d at 619. Those allegations reflect that Martuscello knew of the risk posed by the pervasive culture of excessive force—as well as by some of the CERT Defendants involved in the beating—at Mid-State. In September 2023, one of the CERT Defendants in this action, Levi, attacked Shayzon Taylor, sending him "to the hospital" for treatment of "severe injuries." (Dkt. No. 1, ¶¶ 232–34). Martuscello was "involved in the decision to place" Levi "on a twelve-moth disciplinary period" following this incident, starting in May 2024; Levi remained on that period at the time of Nantwi's fatal beating. (*Id.* ¶¶ 235–38). Martuscello also knew of the New York Court of Claims suit stemming from July 2016 incident, described above, in which another CERT Defendant, Slawson, participated. (*Id.* ¶¶ 182–90, 194). That incident resulted in an OSI investigation, the final report of which Martuscello would have been tasked with reviewing. (*See id.* ¶¶ 118, 191). Plaintiff

---

not had an adequate opportunity to address this argument, and the Court therefore need not consider it. *See, e.g.*, *United States v. Fayton*, 704 F. Supp. 3d 449, 453 (S.D.N.Y. 2023). However, the Court notes that the complaint plausibly alleges the existence of a substantial risk of harm not just to "all incarcerated individuals in DOCCS custody," (Dkt. No. 124, at 11), but also to incarcerated individuals at Mid-State specifically. *See supra* Section II.C.7.

further alleges that Martuscello knew of an attack on another Mid-State incarcerated person—in which CERT Defendants Bartlett and Chandler participated—that occurred the day before Nantwi's killing.[6] (*See id.* ¶¶ 259–66).

Additionally, the 2023 CANY report provided to Martuscello as Acting Commissioner documented "incidents of 'routine [and racialized] abuse by staff, including physical assaults, and observations of a retaliatory environment.'" (*Id.* ¶¶ 196–213). Mid-State correction officers' April 2023 "unprovoked and wholly unjustified" assault of James Barton corroborated these findings—and led to federal § 242 prosecutions with which DOCCS assisted while Martuscello was Acting Commissioner and Commissioner. (*See id.* ¶¶ 216–25). A second 2025 CANY report "reiterated" to DOCCS officials "serious concerns about operational failures at Mid-State," reporting "that conditions [there] had deteriorated considerably since its monitoring visit in October 2022." (*Id.* ¶¶ 247–48; *see also id.* ¶¶ 251–52). CANY emailed the report to Martuscello in January 2025, and he was expected to review it as part of his job duties. (*See id.* ¶¶ 254–56).

Martuscello's reliance on another case from this district—declining to use a CANY report to establish a DOCCS Commissioner's liability—is misplaced. (*See* Dkt. No. 81-1, at 17–18 (citing *Poulos v. Annucci*, No. 9:18-CV-1279, 2019 WL 6311012, at *7–8, 2019 U.S. Dist. LEXIS 203952, at *18–20 (N.D.N.Y. Nov. 25, 2019))). The CANY report in *Poulos*, unlike the two reports here, "was based on a single visit" to the relevant facility "approximately nine years before the" events at issue. *See Poulos*, 2019 WL 6311012, at *7,  2019 U.S. Dist. LEXIS 203952, at *18. And there, the complaint provided no facts to support its conclusory allegations that the Commissioner was aware of the report, or that unconstitutional actions continued to

---

[6] For purposes of this motion, the Court accepts as true Plaintiff's allegation that—despite his position as a high-level DOCCS official—Martuscello knew of this incident on February 28, 2025, after the incarcerated individual's aunt wrote directly to him reporting it. (Dkt. No. 1, ¶ 266). In any event, this allegation is not dispositive on the Court's conclusion.

20

occur years after its publication. *Id.*, 2019 WL 6311012, at *7,  2019 U.S. Dist. LEXIS 203952, at *18–19. Unlike the *Poulos* complaint, the complaint here provides sufficient "factual allegations in support of" Plaintiff's assertion that Martuscello was "aware of, and had reviewed," the 2023 and 2025 CANY reports. *See id.*

Additional allegations reflect Martuscello's knowledge of the pattern, practice, and custom of excessive force throughout DOCCS generally. Martuscello made public statements concerning Robert Brooks's killing—which occurred just three months before Nantwi's—and in those statements "recognized the need for 'institutional change.'"[7] (*See* Dkt. No. 1, ¶¶ 274–87). Since 2022, outside advocates and organizations consistently warned Martuscello of "continual assaults and beatings," as well as "spiraling violence by correction officers." (*See id.* ¶¶ 152, 164–68). And in his current and previous roles, "Martuscello was made personally aware of" persistent civil and criminal litigation reflecting the pattern, practice, and custom, including multiple federal indictments of correction officers. (*See id.* ¶¶ 142–51).

Arguing that certain of these cases could not have established his knowledge of DOCCS's pervasive culture of violence, Martuscello cites various district court cases from within the Second Circuit. (*See* Dkt. No. 81-1, at 19–22). Some of these cases, however, concerned the deliberate indifference standard for municipal liability under *Monell*. *See Calderon v. City of New York*, 138 F. Supp. 3d 593, 612–13 (S.D.N.Y. 2015); *Falls v. Campbell*, No. 17-CV-35, 2019 WL 1255768, at *6, 2019 U.S. Dist. LEXIS 45090, at *17–20 (S.D.N.Y. Mar. 19, 2019); *Kravitz v. Annucci*, No. 16-CV-8999, 2019 WL 1429546, at *9–10, 2019 U.S.

---

[7] Minimizing the significance of similar allegations and others, Martuscello points to information outside the complaint. (*See* Dkt. No. 124, at 7 n.2; Dkt. No. 81-1, at 23–24). But at this stage, the Court generally cannot consider such facts. *See Pearson v. Gesner*, 125 F.4th 400, 406 (2d Cir. 2025). Even could the Court properly consider other portions of a news article cited in the complaint, (*compare* Dkt. No. 1, ¶ 110 n.9, *with* Dkt. No. 124, at 7 n.2), the portions to which Martuscello cites would not alter the Court's conclusion that the complaint plausibly alleges his deliberate indifference.

21

Dist. LEXIS 54428, at *25–29 (S.D.N.Y. Mar. 29, 2019). And others made clear that, although courts may consider whether prior lawsuits "resulted in an adjudication of liability," *Falls*, 2019 WL 1255768, at *6, 2019 U.S. Dist. LEXIS 45090, at *18, there is no "'bright line rule' regarding the number or recency of complaints sufficient to establish notice." *Zielinski v. Annucci*, No. 9:17-CV-1087, 2020 WL 7074845, at *16, 2020 U.S. Dist. LEXIS 213269, at *49 (N.D.N.Y. Nov. 12, 2020), *report-recommendation adopted*, 2021 WL 1152819, at *6, 2021 U.S. Dist. LEXIS 57338, at *15–16 (N.D.N.Y. Mar. 26, 2021); *Kravitz*, 2019 WL 1429546, at *10, 2019 U.S. Dist. LEXIS 54428, at *29. In any event, here Plaintiff relies on more than this litigation history.

The 2015 and 2016 investigation conducted by the New York Times and the Marshall Project revealed a pervasive and "troubling pattern of officer" assaults and "coverups." (*See* Dkt. No. 1, ¶¶ 126–37). That investigation included an interview with Martuscello, who was "personally aware of [its] contents." (*See id.* ¶¶ 138–40). A subsequent 2023 investigation "concluded that staff cover ups of excessive force incidents [were] commonplace across DOCCS facilities." (*Id.* ¶¶ 153–55). Martuscello was interviewed again in connection with this investigation, and the Marshall Project sent him a letter outlining its findings. (*Id.* ¶¶ 156–59).

According to Martuscello, these allegations "at best" establish that this information "was provided to [his] predecessor." (Dkt. No. 81-1, at 16–17). But that contention ignores the above allegations of Martuscello's knowledge of the investigations, including that he was interviewed in connection with both. (Dkt. No. 1, ¶¶ 138–40, 156–58). The Court may reasonably infer at this stage that Martuscello knew of both investigations' contents and findings. *See Faber*, 648 F.3d at 104. Moreover, as detailed above, Plaintiff further alleges that Martuscello knew of the risk posed by CERT officers, as well as conditions caused by the correction officer strikes. (*See* Dkt.

22

No. 1, ¶¶ 308–35). Thus, the complaint plausibly alleges that Martuscello knew of facts from which he could draw the inference that the DOCCS-wide pattern, practice, and custom of excessive force, and the accompanying strict code of silence, created a substantial risk of serious harm to those incarcerated at Mid-State. *See Farmer*, 511 U.S. at 837.

The complaint also plausibly alleges that Martuscello drew the required inference, but failed to act. *See id.*; *cf. Stone #1 v. Annucci*, No. 20-CV-1326, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *35 (S.D.N.Y. Sept. 28, 2021) ("At the motion to dismiss stage, a plaintiff is required only 'to include allegations of the facts or events they claim give rise to an inference of knowledge.'" (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021))). Following Brooks's death, Martuscello publicly "recognized the need for 'institutional change.'" (Dkt. No. 1, ¶ 287). He was also "involved in the decision to" discipline CERT Defendant Levi, who remained on "his disciplinary period" during the Nantwi attack. (*Id.* ¶¶ 236–38). And during Martuscello's tenure as Acting Commissioner and Commissioner, DOCCS assisted federal authorities in building § 242 prosecutions related to a 2023 Mid-State assault. (*See id.* ¶¶ 216–25).

Martuscello does not dispute that he "had [the] ability to mitigate" the relevant risks. *See Suarez*, 170 F.4th at 61. As Commissioner, Martuscello had the "responsibility and authority to set policies, make rules, communicate expectations, issue disciplinary actions, and control the correction officers who worked at Mid-State." (Dkt. No. 1, ¶ 112). Indeed, by virtue of his role, "Martuscello set policies, customs, and practices for DOCCS," and "was ultimately responsible for ensuring the safety of individuals in DOCCS custody." (*Id.* ¶¶ 35–36). According to the complaint, the tools available to Martuscello included, among other things, "counseling, monitoring, temporary reassignment, additional training, pursuing discipline, and meeting with

23

the individual officer and/or their supervisor to discuss the use of force." (*Id.* ¶ 180; *see also id.* ¶¶ 229–30, 271–72 (listing tools available to evaluate and reduce risks posed by particular correction officers)).

Yet he "failed to enact [or] enforce policies that would have prevented attacks on incarcerated individuals like" Nantwi, and otherwise "took no meaningful action to mitigate the risk of serious harm posed by the pattern, practice, and custom of excessive force." (*Id.* ¶¶ 113–14). Nor did Martuscello ensure that Mid-State officers followed the DOCCS body worn camera policy updated "in the wake of" Brooks's death. (*See id.* ¶¶ 294–302). And his failure to take "action to prevent correction officers from covering up excessive force incidents . . . emboldened" correction officers "to conceal their unlawful behavior by filing false reports." (*See id.* ¶ 160); *cf.* Bench Ruling on Motion to Dismiss at 22, *Virgil v. Finn*, No. 7:22-cv-03169 (S.D.N.Y. Oct. 31, 2023), ECF No. 111 ("*Virgil*") ("[A]s common sense would dictate, . . . not disciplining bad behavior perpetuates the culture that emboldens such behavior."). Plaintiff has therefore sufficiently alleged the subjective component of her Eighth Amendment claim. *Farmer*, 511 U.S. at 837; *Tangreti*, 983 F.3d at 619.

Martuscello's remaining arguments are inapposite. Relying on *Iqbal*, he asserts that, "to the extent that plaintiff's complaint simply alleges that . . . Martuscello was 'aware' of the alleged unconstitutional policy, knowledge and acquiescence of an alleged unconstitutional policy is insufficient to establish personal involvement." (Dkt. No. 124, at 8). But the *Tangreti* personal involvement standard discussed above already incorporates the supervisory liability limitations *Iqbal* imposed. *Cf. Tangreti*, 983 F.3d at 616–19 (discussing *Iqbal*'s effect on previous Second Circuit supervisory liability standard). As both of those cases explain, "'[t]he factors necessary to establish a § 1983 violation will vary with the constitutional provision at

issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (alteration adopted) (quoting *Iqbal*, 556 U.S. at 676). *Iqbal* requires only that the violation—here, deliberate indifference under the Eighth Amendment—"be established against the supervisory official directly." *Id.* Tellingly, "numerous district courts within the Second Circuit have determined that Eighth Amendment claims against supervisors who are responsible for the continuation of allegedly unconstitutional policies remain possible following *Tangreti*." *See Dixon v. Farina*, No. 9:25-CV-00068, 2026 WL 482664, at \*14, 2026 U.S. Dist. LEXIS 35430, at \*43–46 (N.D.N.Y. Feb. 20, 2026) (footnote omitted) (collecting cases). And for the reasons given above, Plaintiff has plausibly alleged a deliberate indifference claim against Martuscello "directly." *Tangreti*, 983 F.3d at 618.

Martuscello further notes that the complaint does not allege he participated or was present for Nantwi's killing. (Dkt. No. 81-1, at 14–15). Prison officials, however, may be deliberately indifferent to a serious risk where they "knew of the [relevant] dangers and yet refused to remedy the situation." *See LaBounty*, 137 F.3d at 73. Nor does the fact that Martuscello received no "complaints from . . . Nantwi or anyone on [his] behalf" change the analysis. (Dkt. No. 81-1, at 15). For Martuscello to be liable, Nantwi need not have "foresee[n] the risk that" Mid-State correction officers would murder him at some future point, and then "address[ed] that risk with" Martuscello. *See Dixon*, 2026 WL 482664, at \*16, 2026 U.S. Dist. LEXIS 35430, at \*49.

Finally, this outcome does not "render[] the requirement of personal involvement meaningless." (Dkt. No. 124, at 11). Plaintiff has marshaled extensive, detailed allegations of Martuscello's deliberate indifference to conditions posing a substantial risk of serious harm to Nantwi at Mid-State—including a "longstanding pattern, practice, and custom of excessive force

25

and the resulting culture of violence" there and "within [other] DOCCS facilities." (Dkt. No. 1, ¶ 107). Like other district courts in analogous cases involving DOCCS Commissioners, the Court concludes only that, on these facts, Plaintiff's failure-to-protect claim may proceed past the pleading stage. *See Stone #1*, 2021 WL 4463033, at *9–11, 2021 U.S. Dist. LEXIS 186195, at *33–41; *Dixon*, 2026 WL 482664, at *13–17, 2026 U.S. Dist. LEXIS 35430, at *41–54; *Virgil* at 17–25. And even were future plaintiffs to set forth similarly extensive allegations, (*see* Dkt. No. 124, at 11), "the remedy would be to do more . . . to stop abusive practices, not to stop lawsuits against supervisors plausibly deliberately indifferent to a substantial risk of danger to the [individuals] in their custody," *see Virgil* at 25.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Martuscello's motion to dismiss Plaintiff's Eighth Amendment failure-to-protect claim against him (Dkt. No. 81) is **DENIED**; and it is further

**ORDERED** that Martuscello's motion to dismiss Levi's crossclaim against him (Dkt. No. 148) is **GRANTED**; and it is further

**ORDERED** that Levi's crossclaim against Martuscello is **DISMISSED without prejudice**, and Levi may file an amended answer curing the above-identified deficiency as to contractual indemnification, within 30 days of the date of this decision, if he so chooses; and it is further

**ORDERED** that the Clerk is respectfully directed to serve a copy of this decision on all pro se parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: <u>August 12, 2026</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

26